Samuel **SHAPIRO**, Appellant,

v.

Thomas E. **FERRANDINA**, United States Marshal for the Southern District of New York, Appellee.

No. 702, Docket 73–1179.

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1973.

Decided April 6, 1973.

896

Nathan Lewin, Washington, D. C. (William H. Jeffress, Jr., and Miller, Cassidy, Larroca & Lewin, Washington, D. C., of counsel), for appellant.

Michael B. Mukasey, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for S. D. New York, of counsel), for appellee.

Before FRIENDLY, Chief Judge, OAKES, Circuit Judge, and DAVIS,[*] Judge.

FRIENDLY, Chief Judge:

In June, 1970, the appellant Samuel Shapiro [1] was arrested in Israel, together with his partner Shalom Blumberg, on charges, discussed in detail below, relating to an allegedly fraudulent investment enterprise managed by the two from 1967 to 1970. Both were interrogated and released on bail. Later in 1970 Shapiro came to the United States, where he had earlier attended high school and had numerous business and personal contacts. Since that time he has been living in this country, although at present deportation proceedings have been commenced against him on the ground that he has overstayed the limits on his tourist entry visa. On January 12, 1971, a nineteen-count indictment was issued against Shapiro and Blumberg in Israel. After a number of continuances granted in an unsuccessful attempt to bring Shapiro before the Israeli court, the trial commenced against Blumberg in April, 1972. Although, as appears below, a synopsis of much of the testimony heard at Blumberg's trial appears in the record of this case, no official record of the decision has been offered us. We are told by counsel for the government, however, that Blumberg was convicted on at least some of the counts charged.

In November, 1972, diplomatic officials of Israel requested the extradition of Shapiro to face trial for the offenses charged. The request was based upon the Convention on Extradition between the Governments of the United States of America and the State of Israel. 14 U. S.T. 1708–14, T.I.A.S. No. 5476, ratified in 1963. On November 30, 1972, a warrant for Shapiro's arrest was signed by Judge Motley, of the District Court for the Southern District of New York, pursuant to which Shapiro was arrested at his home in Brooklyn, New York, on December 2. His application for release on bail came before Judge Pollack, also of the Southern District of New York, on December 4. Judge Pollack directed that Shapiro be so released but set for December 21 a hearing on the extradition before himself pursuant to 18 U.S. C. § 3184. Prior to the hearing, Shapiro applied to this court for a stay of the extradition proceedings and a writ of mandamus requiring the district court to dismiss the action or, alternatively, to transfer it to the Eastern District of

---

[*] Of the United States Court of Claims, sitting by designation.

[1]. Petitioner's name will be used in this opinion in its Anglicized form. He is referred to in the translated documents in the record as Shmuel Shapira.

New York pursuant to 28 U.S.C. § 1406(a), on grounds that will later appear. These requests were denied. After hearing testimony extending over two days and receiving memoranda and briefs, Judge Pollack issued a decision, dated January 8, 1973, 352 F.Supp. 641, certifying to the Secretary of State that the evidence before him warranted extradition and committing Shapiro to the custody of the United States Marshal.

On January 11, Shapiro brought a petition for habeas corpus in the District Court for the Southern District of New York, which was assigned to Judge Gurfein. After a hearing at which oral argument was presented, Judge Gurfein, in an opinion dated January 31, 1973, 355 F.Supp. 563, dismissed the petition, although holding that Shapiro was not extraditable for the offense charged in Count 18 of the Israeli indictment. Shapiro appealed, arguing, as he had below, that Judge Pollack's order was void for want of proper jurisdiction and/or venue; that there was insufficient competent evidence to justify the order; and that the judge failed to specify certain crimes which are urged to be non-extraditable.

## I. *Jurisdiction and Venue.*

Shapiro advances a number of arguments concerning Judge Pollack's power to order his detention and certify his extradibility.

The first argument, namely, that both the Government's complaint and the warrant for his arrest issued by Judge Motley failed to specify, *in haec verba*, that he was "found" within the Southern District of New York is plainly without merit. The relevant statute, set out in pertinent part in the margin,[2] calls only for a complaint under oath stating that the person sought has committed within the jurisdiction of the requesting country a crime covered by a treaty. If the person sought is, in fact, "found" within the district, the omission of a statement to that effect in the complaint, the warrant, or both will not invalidate the arrest.

Beyond that, common sense dictates a holding that such a complaint and warrant would support an arrest in another district, provided that the government reasonably and in good faith believed that the person sought could be found within the district which issued the warrant and intended to arrest him there, compare Pettit v. Walshe, 194 U.S. 205, 219, 24 S.Ct. 657, 48 L.Ed. 938 (1904). The government can never be certain that the person desired will in fact be found in the district by the time the warrant has issued, and any other view would mean that a person sought for extradition could avoid this by constantly moving from one district to another. United States v. Provoo, 124 F.Supp. 185 (S.D.N.Y.), rev'd on other grounds, 215 F.2d 531 (2 Cir. 1954), heavily relied on by Shapiro, is not to the contrary. This arose under a statute, 18 U.S.C. § 3238, dating back to § 8 of the Act of April 30, 1790, 1 Stat. 112, providing that prosecution for crimes on the high seas or out of the jurisdiction of any particular district should take place "in the district where the offender is found, or into which he is first brought." See also United States v. Townsend, 219 F. 761 (S.D.N.Y.1951). Since, by hypothesis, the offender has been located and is subject to arrest, the danger of his avoiding the latter does not arise.

The record leaves no doubt that, in seeking a warrant in the Southern District of New York, the government was acting on a good faith belief that

---

2. Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged . . .

18 U.S.C. § 3184.

Shapiro could be "found" there. He had considerable activities within that district—extensive business contacts; the impending purchase of a home in Monsey, New York, where he was already conducting business; and the existence of a bond release from the Immigration and Naturalization Service district office in Manhattan. Moreover, as we were told at argument, the government first attempted to apprehend him in Monsey.

Shapiro argues that, however this might otherwise be, a different result is required here because the affidavit accompanying the complaint stated that "the said Samuel Shapiro . . . may be found in the State of New York and the City of New York, in the Borough of Brooklyn, at 5612—12th Avenue," where he was in fact arrested, after the unsuccessful attempt to do this in the Southern District. We must confess inability to understand why this was included. We were told that the purpose was to assist the marshal, but this could have been done by less formal means. However, the assertion that Shapiro could be found in the Eastern District does not destroy the government's good faith belief that he could also be found in the Southern. Since, in the absence of the quoted statement, Shapiro could have been arrested in the Eastern District under a warrant issued by the Southern, we fail to see how he was prejudiced by the unneeded surplusage, which, we were told, the government offered to remove *nunc pro tunc* at the first hearing before Judge Pollack, an offer refused by Shapiro's counsel.

Shapiro's final argument on this phase of the case is that even if the arrest in Brooklyn was valid, he should then have been taken before a judge or magistrate in the Eastern, not the Southern, District for the extradition hearing. For this he relies primarily on Pettit v. Walshe, *supra*, 194 U.S. 205, 24 S.Ct. 657, 48 L.Ed. 938. In that case Walshe was arrested in Indiana on a warrant for extradition issued from the Southern District of New York. On a petition for habeas corpus brought in Indiana, the trial court released him, on the ground that a warrant issued in New York was ineffective in Indiana. Although the Court upheld the validity of the arrest, 194 U.S. at 219, 24 S.Ct. 657, it affirmed the order of release on the ground that the marshal "in his return to the writ of habeas corpus distinctly avowed his purpose, unless restrained by the court, to take the prisoner at once from the state in which he was found, and deliver him in New York. . . ." 194 U.S. at 220, 24 S. Ct. at 662. This, the Court ruled, violated the marshal's "duty . . . to take the accused before the nearest magistrate in that district . . . to hear and consider the evidence of [his] criminality." *Id.* at 219, 24 S.Ct. at 662. Focusing on the words "in that district," Shapiro argues that he was denied his right to be heard by the nearest magistrate by being brought across the East River to the Southern District.

The argument fails to take account of the Court's reasoning in *Pettit.* The Court emphasized that, under the provisions of the applicable treaty, the evidence of Walshe's criminality must suffice to justify his commitment for trial "according to the laws of the place where the fugitive or person so charged shall be found"—in that case, Indiana. Thus, transportation to New York for a hearing would entail having the sufficiency of the evidence assessed under a totally different body of laws. Here, however, both the Southern and the Eastern Districts are within the state of New York and would apply, insofar as is relevant to an extradition hearing, identical law. Shapiro thus does not fall within the *Pettit* rule.

II. *Competence and Weight of the Evidence.*

In attacking the weight and competence of the evidence before the extraditing magistrate, Shapiro labors under two sets of difficulties. First, the function of the extraditing magistrate is not to decide guilt or innocence

but merely to determine whether there is "competent legal evidence which . . . would justify his apprehension and commitment for trial if the crime had been committed in that state." Collins v. Loisel, 259 U.S. 309, 315, 42 S.Ct. 469, 471, 66 L.Ed. 956 (1922). See also Benson v. MacMahon, 127 U.S. 457, 463, 8 S.Ct. 1240, 32 L.Ed. 234 (1888); 4 Hackworth, Digest of International Law 115–18 (1942). Thus, evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing. Charlton v. Kelly, 229 U.S. 447, 456, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). Second, the magistrate's decision is not itself appealable. Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920); Jimenez v. Aristeguieta, 290 F.2d 106 (5 Cir. 1961),[3] and review of his decision generally must be pursued by writ of *habeas corpus,* 4 Hackworth *supra,* at 174–75 (1942), which, at least in theory, is more restricted than review on appeal. The *habeas* judge can only "inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any [competent] evidence warranting the finding that there was reasonable ground to believe the accused guilty." Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); see also

Charlton v. Kelly, *supra,* 229 U.S. at 456, 33 S.Ct. 945; Gallina v. Fraser, 177 F. Supp. 856, 867 (D.Conn.1959); aff'd, 2 Cir., 278 F.2d 77 (1960), cert. denied, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960); Jimenez v. Aristeguieta, 311 F.2d 547, 555 (5 Cir. 1962). The guiding principle is furnished by Article V of the present Treaty which provides that "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, . . . to justify his committal for trial. . . ." As both parties recognize, the phrase "the laws of the place where the person sought shall be found" refers to the laws of the state where the arrest occurs rather than to the laws of the United States.[4]

■ Shapiro argues first that there was insufficient competent evidence before the magistrate to satisfy New York's test for sufficiency of the evidence necessary to hold a defendant prior to trial since New York's recently enacted Criminal Procedure Law § 180.60, subd. 8 (McKinney's Consol.Laws, c. 11–A 1971) provides that, at a preliminary hearing and subject to an exception not here material, "only non-hearsay evidence is admissible to demonstrate reasonable cause to believe that the defendant committed a felony," while here Judge Pollack based his finding primari-

3. The *Jimenez* court reasoned that it did not have jurisdiction under the general appeal statute, 28 U.S.C. § 1291, although there as here a district judge had presided at the extradition hearing, since such a decision is not encompassed in the term "appeals from all final decisions of the district *courts* of the United States," (emphasis added) but was the decision of a district *judge* sitting as magistrate. Although this approach is criticized in 61 Mich.L.Rev. 383 (1962), it seems sound in light of the fact that 18 U.S.C. § 3184 permits the hearing to be conducted by a magistrate or a judge of a state court of record or for that matter, by a judge of a court of appeals or a justice of the Supreme Court. The accident that a district judge has elected to conduct the hearing should not provide a basis for

appealability that would not otherwise exist.

4. This was explained by the Supreme Court in Pettit v. Walshe, *supra,* 194 U. S. at 217, 24 S.Ct. at 661:

But as there are no common-law crimes of the United States, and as the crime of murder, as such, is not known to the national government, except in places over which it may exercise exclusive jurisdiction, the better construction of the treaty is that the required evidence as to the criminality of the charge against the accused must be such as would authorize his apprehension and commitment for trial in that state of the Union in which he is arrested.

See also Wright v. Henkel, 190 U.S. 40, 58–63, 23 S.Ct. 781, 47 L.Ed. 948 (1903).

ly, indeed entirely,[5] on written statements and records of testimony of persons not before him and not subject to cross-examination by Shapiro.

While the argument is ingenious, it runs afoul of 'Collins v. Loisel, *supra*, 259 U.S. at 317, 42 S.Ct. 469, as well as of good sense. Dealing with the Extradition Treaty with Great Britain, 8 Stat. 572, 576 (1842), whose language differs from the treaty with Israel in form but not in substance, Mr. Justice Brandeis said that the treaty's reference to "evidence of criminality" referred "to the scope of the evidence or its sufficiency to block out those elements essential to a conviction," not "to the character of the evidence or to the rules governing admissibility." He added, even more pertinently:

> Thus, unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the State on a preliminary examination.

Furthermore, 18 U.S.C. § 3190 provides that, subject to proper certification, to be discussed below, "[d]epositions, warrants, or other papers or copies thereof . . . shall be received and admitted as evidence . . ." in extradition hearings, which would override the New York statute with respect to the inadmissibility of hearsay in any event. Beyond this, the principle Shapiro asks us to adopt would run counter to one of the prime objects of bi-lateral extradition agreements, namely, "to obviate the necessity of confronting the accused with the witnesses against him; . . . [requiring] the demanding government

to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." Bingham v. Bradley, 241 U.S. 511, 517, 36 S. Ct. 634, 637, 60 L.Ed. 1136 (1916); Note, United States Extradition Procedures, 16 N.Y.Law Forum 420, 442–43 (1970). Counsel contends this consideration has lost force in the era of the jet airplane and rightly reminds us that what we here decide would apply equally if Shapiro were an American rather than an Israeli citizen. But even today the transportation of witnesses thousands of miles has elements of trouble and expense, and a further appropriate rejoinder to counsel's reminder is that extradition is always a two-way street.

Struggling to avoid the force of all this, Shapiro's able counsel says "our argument does not, of course, go to admissibility or competence; it relates to sufficiency." We fail to see any basis for this characterization. The New York statute on which he relies itself speaks in terms of "admissible" evidence to demonstrate reasonable cause in a felony hearing; a prior section defining "reasonable cause," N.Y.Crim.Proc.L. § 70.-10, subd. 2, expressly provides that in general "apparently reliable evidence may include or consist of hearsay." The recent addition to § 180.60, subd. 8 barring use of hearsay evidence in preliminary hearings in felony cases thus is not a matter of sufficiency, which is independently defined, but rather a restriction on the *kind* of evidence in hearings relating to particularly serious crimes. In extradition hearings, see Collins v. Loisel, *supra*, this is precisely the sort of issue to be determined by national rather than by state law.[6]

---

5. Although Shapiro testified at the hearing, Judge Pollack's opinion does not suggest that his decision rested on any inculpatory information arising from this testimony.

6. We note in passing that hearsay evidence of the type in question here would be admissible in preliminary hearings under the American Law Institute's Model Code of Pre-Arraignment Procedure § 330.4(4)

(Tent. Draft 1972) and the Proposed Amendments to the Federal Rules of Criminal Procedure § 51(a), reprinted at 48 F.R.D. 567 (1970). The former conditions admissibility on a determination by the presiding judge that "it would impose an unreasonable burden on one of the parties" to require direct testimonial proof. The commentary for each of these rules gives the example of a distant primary witness as the principal rationale for

A more troubling problem is whether the certification procedures actually used in this case were sufficient to place the documents and testimony at Blumberg's Israeli trial before the extraditing magistrate. The statute, 18 U.S.C. § 3190, begins by saying that the "[d]epositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case" shall be received if "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped. . . ." This can be established by testimony of an expert in the law of the demanding country, see, e. g., Argento v. Horn, 241 F.2d 258, 263 (6 Cir.), cert. denied, 355 U.S. 818, 78 S.Ct. 23, 2 L.Ed.2d 35 (1957); 6 Whiteman, Digest of International Law 968 (1968),

but no independent testimony of Israeli law was proffered here. Section 3190 continues—and it is upon this that the government has chosen to rely—that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required," and such a certification is conclusive. See 6 Whiteman, *supra*, at 969–70; 1 Moore, Extradition 499–501 (1891). The difficulty stems from the arguable incompleteness of the American Ambassador's certification.

Three separate certificates were executed by the Ambassador. All are on Foreign Service Form No. 36, entitled "Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition." There follows:

AMERICAN FOREIGN SERVICE

------------------------
(Place and date)

I, _____, _____ of the United States of America at _____ hereby certify that the annexed papers, being _____

_____

proposed to be used upon an application for the extradition from the United States of _____, charged with the crime of _____ alleged to have been committed in _____, are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of _____, as required by the Act of Congress of August 3, 1881.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this _____ day of _____.
(Month and year)

----------------------------------------------
_____ of the United States of America.

The first certificate describes the annexed papers as "an affidavit by Eli Nathan, Senior Deputy State Attorney, Ministry of Justice, Jerusalem," which contains translations of various provisions of the Israeli criminal code; Shapiro raises no question about this. The two other certificates are rather similar. One describes the attached papers as "a Statement of Charge, Application for

---

a flexible standard. The commentary to the ALI Model Code, at 88–90, states that "most" states do not use the normal rules

of evidence at the preliminary hearing stage, although it cites three states *contra*.

Arrest and Order to Compel Attendance"; these are in Hebrew. The other describes the annexed papers as "certified translations of Statement of Charge, Application for Arrest and Order to Compel Attendance"; these attachments are in English.

Shapiro raises no question concerning the certification of the three documents specifically mentioned in the two latter certificates. His point is that these establish only that he is sought for certain crimes in Israel, but not that there is sufficient, or any, evidence of his guilt. For that one must look to the other papers attached,[7] and he says that as to these, not mentioned in the certificate, there is no certification that they were "properly and legally authenticated so as to entitle them to be received" on a hearing in Israel.

■■■ While again applauding the ingenuity of the argument, we reject it as "savor[ing] of technicality," Bingham v. Bradley, *supra*, 241 U.S. at 517, 36 S.Ct. 634, which is peculiarly inappropriate in dealings with a foreign nation. As indicated by its title, the form was clearly designed to cover all material needed under 18 U.S.C. § 3190. Although the explicit reference was only to the Statement of Charge, Application for Arrest and Order to Compel Attendance, this was doubtless due to lack of further space on the form and the Ambassador must have known that such documents alone would serve no purpose. The third certificate, which is of particular importance, is affixed with an official, embossed seal of the American Embassy in Israel, to which is attached a ribbon binding the certificate, the translator's affidavit, the arrest orders, and 23 pages of translation from the charge. The translator's certificate, in turn, is bound by a separate ribbon, affixed by a seal of the Ministry of Foreign Affairs, to the entire body of papers. Many of the papers bear legends such as "Rubber Stamp: District Court of Tel Aviv-Jaffa, checked by Yosef Levi and found true to the original" followed by Levi's signature. It is unlikely in the last degree that the Ambassador would have allowed his deal to be attached to only a portion of the "certified translations" *before* the translator had himself attached and sealed his own certificate to the entire body of translated material. While the government should be able to spare the courts from having to spend time on questions of this sort, in the absence of any showing that the documents were not authentic or not of the sort admissible in Israel for purposes of establishing the sufficiency of the evidence, we are unwilling to order Shapiro's release pending more satisfactory certification.[8]

■■■ Finally, so far as concerns this phase of the case, Shapiro contends that Judge Pollack committed an error of law in failing to pass upon the credibility of the evidence before him, as revealed in various statements at the hearing such as "the assertion . . . is a matter of credibility and that is an issue that I don't have to pass on," and in refusing to allow Shapiro to produce certain witnesses from Israel to testify on his behalf. As indicated above, we are restrained on this appeal both by the

---

7. Some of these attachments were documents received in evidence at Blumberg's trial. The Government characterizes much of the rest as testimony at that trial. The statements of the various witnesses seem to be answers to questions posed by lawyers for the Israeli Government and Blumberg; the attorneys' questions, however, are omitted, with the result that the testimony appears as a series of monologues.

8. In contrast, the certificate relating to the papers in Hebrew is bound by ribbon and seal only to the first three pages of the documents, which in turn are bound to the remaining papers only by removable metal clips. Whether the latter papers were earlier bound to the certificate by another ribbon and seal, as with the translations, which was removed for convenience at a later point, is a matter of little importance, since for those not versed in Hebrew the documents are of only ceremonial value.

limited nature of the magistrate's hearing and by the standards of review on habeas corpus. The magistrate's function is to determine whether there is "any" evidence sufficient to establish reasonable or probable cause, Fernandez v. Phillips, *supra*, 268 U.S. at 311, 45 S. Ct. at 541, and the extraditee's right to introduce evidence is thus "limited to testimony which explains rather than contradicts the demanding country's proof, and its precise scope is largely in the Commissioner's discretion." United States ex rel. Petrushansky v. Marasco, 325 F.2d 562, 567 (2 Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 969, 11 L. Ed.2d 971 (1964) (extradition order valid despite refusal to allow certain witnesses to testify) ; see also Charlton v. Kelly, *supra*, 229 U.S. at 461, 33 S.Ct. 945; Collins v. Loisel, *supra*, 259 U.S. at 315–316, 42 S.Ct. 469. The judge's refusal to examine the credibility of the testimony and statements included in the translated material was clearly proper, since the declarants were not before him. Furthermore, the testimony and witnesses excluded by him were offered to prove, variously, that one declarant of an inculpatory statement had once blackmailed Shapiro's father and that certain fraudulent statements alleged to have been made by Shapiro had not in fact been made. If allowed, such statements would in no way "explain"—or, as the district judge put it, "obliterate"—the government's evidence, but would only pose a conflict of credibility. Such a contest, the judge permissibly ruled, should properly await trial in Israel.

Further discussion of the sufficiency of the evidence as to each offense named in the charge will be made below.

### III. *Extraditability of the Particular Offenses.*

Shapiro's next complaint concerns the failure to rule whether each offense charged was listed in the extradition treaty, was criminal under the laws of New York and was supported by sufficient evidence.

Judges Pollack and Gurfein appear to have differed in their views of their duties in this regard. Judge Pollack limited his role to determining whether Shapiro himself was extraditable for any of the offenses charged;[9] Judge Gurfein on the other hand, referred without citation to "the recognized rule that the country of asylum may limit the trial of the fugitive in the demanding country to those crimes which have been shown to be extraditable offenses in law and where probable cause has been shown on the evidence." We think that Judge Gurfein was right but that he did not pursue his inquiry far enough.

The "principle of specialty," long recognized in international law, provides that "the requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited." Friedmann, Lissitzyn & Pugh, International Law 493 (1969) ; see generally 1 Moore, Extradition 194– 259 (1891). In United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886) the Supreme Court established the rule of domestic law that the courts of this country will not try a defendant extradited from another country on the basis of a treaty obligation for a crime not listed in the treaty. While this determination might appear to be limited to circumstances indicating a possible evasion of the treaty, the principle has been extended to bar prosecution for crimes listed in the treaty but for which extradition, for whatever reason, was not granted. See Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); Greene v. United States, 154 F. 401, 407–408 (5 Cir. 1907); see generally 1 Moore, *supra*, at 245–256.

9. He characterized the hearing as being limited to deciding "whether the evidence submitted evinces probable cause to suppose that the specified extraditable offenses *or any of them* were committed by Shapira [sic]." 352 F.Supp. at 644.

■ This self-imposed restraint, however, need not necessarily imply that in the converse situation, when courts of this country are examining an extradition request from a foreign nation, we should seek to impose limits on the scope of subsequent prosecution of a person who is to be extradited for at least one crime in any event. Since such a ruling can only be advisory in character, and in certain circumstances might cause embarrassments to the executive branch in the conduct of foreign affairs, arguably it should be left to the Secretary of State to determine whether to seek to impose any limitations since he alone will have the duty of making a response if the requesting state chooses not to follow our limitations.[10]

A number of considerations, however, lead us to conclude that a judicial determination of extraditability as to separate offenses, even if the extraditability of the *person* is conceded or is independently determined, is a proper exercise of judicial authority in a case such as this.

■ As a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused. See 1 Oppenheim, International Law 702 (8th ed. Lauterpacht 1955); United States ex rel. Donnelly v. Mulligan, 76 F.2d 511 (2 Cir. 1935) (extraditing country may consent

to further extradition to third country). This is reflected in the terms of the Treaty with Israel itself, which states that an extraditee shall not be tried "for any offense other than that for which extradition has been *granted*," (emphasis added), rather than for any offenses "listed in the Treaty."

■ Moreover, while the conduct of foreign affairs is almost exclusively an executive function, extradition has, at least in the United States, see 2 O'Connell, International Law 803 (1965), been generally a matter of judicial competence. While we have no doubt that the Secretary of State could, if he wished, narrow the terms of extradition approved by the magistrate, see 18 U.S.C. § 3186,[11] we see little reason why a prior judicial determination would be viewed by him as an unwanted intrusion upon executive power. Indeed, on at least one occasion the Secretary has indicated a willingness to adopt the findings of an extradition magistrate as to the sufficiency of the evidence in some but less than all of the crimes charged. Letter; Secretary of State to Ambassador of Venezuela, *printed in* 6 Whiteman, *supra*, at 1051. Purely as a practical matter it would seem reasonable for the courts of this country to make an initial finding of extraditability of particular offenses. As will appear below, Shapiro calls upon us to determine whether the acts charged constitute criminal offenses under the laws of New York.[12] Such a

---

10. While this argument was made with respect to prosecutions in the United States by Chief Justice Waite in his dissent to United States v. Rauscher, *supra*, 119 U.S. at 434–436, 7 S.Ct. 234, and was there rejected, such rejection need not be dispositive in the converse case here presented. Quite arguably, the Executive's responsibilities and need for flexibility are greater when the extradition is to another country, in which the sole effective remedies are diplomatic ones, than in the case of extradition to this country where the courts can see to it that the Executive lives up to our international obligations.

11. A Note written in 1962 indicates that the Secretary refused extradition after certification only twice in the prior

twenty-one years, in each instance under treaty provisions explicitly granting him such discretion. The Note concludes, however, that the Secretary has the power to make "a de novo examination of the case to determine whether the requirements of the treaty have been met." Note, Executive Discretion in Extradition, 62 Colum. L.Rev. 1313, 1328–29 (1962).

12. The requirement of "double criminality"—that is, that the offense for which a person is extradited must be punishable as such under the laws of both the requesting and the requested nation—has been described as a "solution" to the problem of ascertaining relative standards of gravity: "The understanding at the basis of extradition treaties is that the proce-

task of ascertaining and, if necessary, interpreting local law is particularly suited to the capacities of the judicial branch.

Having concluded that the extradition magistrate should have culled extraditable from non-extraditable offenses, we must still determine whether his failure to do this is curable on a writ of habeas corpus in a case where extradition for at least one offense was proper. In two cases decided in 1916, not cited to us for this proposition by counsel, the Supreme Court indicated that in extradition matters the writ could test only the validity of the detention of the individual; thus, if a petitioner were found properly extraditable on *any* ground a federal habeas court's inquiry would be at an end: "[I]f only one [crime] is extraditable by the treaty, this does not render [the] appellant's detention unlawful, since it is not to be presumed that the demanding government will suffer him to be tried or punished for any offense other than that for which he is surrendered, in violation of . . . the treaty . . ." Bingham v. Bradley, 241 U.S. 511, 514–515, 36 S.Ct. 634, 636, 60 L.Ed. 1136; Kelly v. Griffin, 241 U.S. 6, 36 S.Ct. 487, 60 L.Ed. 861. Later, however, the Supreme Court on at least one occasion accepted without comment the finding of a lower federal court on a habeas petition that the evidence before the magistrate sufficed as to one count in an extradition proceeding but not as to another. Collins v. Loisel, *supra*, 259 U.S. at ·311, 42 S.Ct. 469. Thus, especially since no appeal will lie from the magistrate's order, see note 3 *supra*, a habeas court will properly look beyond the mere legality of detention.

A final problem is whether our implementation of the principle of specialty entails a determination of the extraditability of *acts* or a more detailed examination of the extraditable nature of the charged *crimes*. The Israeli Government's charge against Shapiro, as it appears in certified translation, contains nineteen separate "counts." Each of these relates to a factual transaction or series of. transactions alleged to have been perpetrated by Shapiro or with his complicity, and as to each of these, two, three, or four separate violations of cited portions of Israel's criminal law are charged. As will appear below, as to every count at least one of the violations charged would not, standing alone, support an extradition order, for want of compliance with the Treaty, lack of a complementary crime under New York law, failure to demonstrate probable cause, or unavailability of a text of the Israeli law charged. Under a limited interpretation of our function, we might reasonably deem each act or series of acts an "offense" which is extraditable if any one of the criminal code provisions cited is violated, provided such violation meets the test of extraditability. On the other hand, violations of each of the separate laws cited might be considered an "offense," in which case it would be incumbent upon us not only to determine whether the acts complained of would be criminal if performed in New York, see note 12 *supra*, but also to assess whether the facts and law cited could correspond to a parallel legal violation if performed here.

The former position finds some support in Justice Brandeis' opinion in Collins v. Loisel, *supra*, 259 U.S. at 312, 42 S.Ct. at 470, in which he stat-

---

dure will be employed only in cases of 'grave offenses'. The reason for this is that the trouble involved is only justified by the turpitude attaching to the act. However, what is 'grave' to one country is not to another." O'Connell, *supra*, at 794. The rule has been adopted in various formulations by the Supreme Court. "The general principle of international law is that in all cases of extradition the

act done on account of which extradition is demanded must be considered a crime by both parties . . . ." Wright v. Henkel, *supra*, 190 U.S. at 58, 23 S.Ct. at 785; Collins v. Loisel, *supra*, 259 U.S. at 312, 42 S.Ct. 469. But see Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), discussed *infra* at notes 19–21.

ed: "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be co-extensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." See also Bryant v. United States, 167 U.S. 104, 108, 17 S.Ct. 744, 42 L.Ed. 94 (1897). This reasoning, however, was directed to the problem arising when the law of one jurisdiction gives a name for a certain criminal act which differs from the name for the same act in the law of the asylum state.[13] In situations where the laws of both the requesting and the requested party appear to be directed to the same basic evil, the contrary rule is applicable.[14] In United States v. Rauscher, *supra*, 119 U.S. 407, 7 S.Ct. 234, for example, the Court acknowledged that prosecution for the crime not specified in the order of extradition might well have been based on exactly the same evidence presented to the magistrate in extradition proceedings in Britain, but concluded that the extraditing state has the privilege of granting or refusing extradition irrespective of whether it has already decided to extradite for another criminal charge based on the same acts. *Id.* at 431–432, 7 S.Ct. 234. Since different legal characterizations of an act or series of acts can lead to increased or cumulative punishment, as will appear below in this case, or to punishment for "political" crimes, cf. Karadzole v. Artu-

kovic, 247 F.2d 198 (9 Cir.), rev'd mem., 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1957), the asylum state, in this case through the Secretary of State, see 18 U.S.C. § 3186,[15] may wish to exercise its privilege of assessing the probable severity of treatment likely to be accorded the extraditee. Nothing in this court's opinion in United States v. Paroutian, 299 F.2d 486 (2 Cir. 1962), is to the contrary. There the United States procured the extradition of the defendant from Lebanon on an indictment which charged only a conspiracy to violate the drug laws, and then proceeded to prosecute him for the substantive crimes of receipt and concealment of heroin. The court concluded that "the test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate.'" In that case the Lebanese government had specified that Paroutian was being extradited for "trafficking in narcotics," and thus no affront to the extraditing country was foreseeable. See also Fiocconi v. Attorney General, 462 F.2d 475 (2 Cir. 1972). In situations like the present, however, where the crimes charged appear to be cognates of similarly named offenses in the United States, we are faced with neither a mere lack of parallelism in nomenclature, as in Collins v. Loisel, *supra,* nor with crimes so factually intertwined as to constitute a logical whole, as in United States v. Paroutian, *supra.* Rather,

13. In Collins v. Loisel, the petitioner Collins fought extradition from Louisiana to India on the ground that the crime alleged to have been committed by him— "cheating"—did not appear in the list of extraditable crimes in the applicable treaty, nor was it a crime recognized in Louisiana. The Court determined that "cheating", as defined in the Indian Penal Code, contained the same elements as the crime of "obtaining property by false pretenses," recognized by both the treaty and Louisiana, and thus extradition would lie for one accused of committing that offense.

14. The Treaty itself indicates that the extraditing nation may inquire into the

nature of the crime charged as well as of the act committed. Article XIII prohibits prosecution of one extradited "for any *offense* other than that for which extradition has been granted," (emphasis added) while Article II lists as extraditable "offenses" 31 different genera or categories of crimes.

Writing in 1891, Professor Moore criticized the application of the principle of specialty when it prohibited prosecution for a lesser included offense, thus implying that the principle was strictly interpreted to bar prosecution for crimes other than those charged even if based upon the same acts. 1 Moore, *supra*, at 246–51.

15. See note 11 *supra.*

the multiple characterizations of the acts charged raise potential problems of greatly increased punishment through successive sentences or, under circumstances not present here, of "political" punishment for minor criminal offenses.[16] Thus, as a matter of domestic law implementing the international principle of speciality, see American Law Institute, Restatement (Second) of Foreign Relations Law of the United States, § 3, Comment h (1965) it is appropriate for us to inquire into the extraditability of the offenses charged, as well as of the acts on which the offenses are based.

The basic scheme alleged to have been contrived by Shapiro and Blumberg was described by Judge Pollack as follows:

> [Blumberg and Shapiro] organized Shahak Investment Fund, Ltd., Shaham Investment Fund, Ltd. and Otzar Merkazi, Ltd. in each of which Shapira owned 55% of the stock and Blumberg owned 45% of the stock; both were the active directors.
>
> Seemingly, the activity initially was like that conducted previously by Shapira, i.e., financial broking for a commission from the institutions which received the money. However, customers would be steered to invest their money in Shaham or other private companies against a guarantee by Otzar Merkazi. Shaham invested in foreign securities with the money provided by such customers. Shaham paid the interest to the customers and a commission to Shahak. The customer would be conditioned by a recital of various banks with whom business had been done and the rates of interest they paid and then Otzar Merkazi was included as paying a higher rate,

similar to what private firms would pay.

> Otzar Merkazi's business stationery announced that they were Bank's Brokers and carried an ambiguous reference to a company connected with Hapoel Hamizrachi, the religious party in Israel. Persons doing business with Otzar Merkazi testified that they were led to believe that they were dealing with and guaranteed as to repayment by a bank or an affiliate of a bank, or that Otzar Merkazi's guaranty was essentially the guaranty of Hapoel Hamizrachi. The fact that Otzar Merkazi was the personal company of Shapira and Blumberg with little or no assets was allegedly concealed from the investors. In short, it is now claimed by the investors that they were led to believe that Otzar Merkazi was something other than it was. As may be surmised, the loans soured and Otzar Merkazi became bankrupt.

352 F.Supp. at 643.

■■■ *Count One.* The first count describes the general fraudulent scheme followed by Shapiro and Blumberg, on the basis of which they are charged with two conspiracy violations. As to the latter, a "conspiracy to defraud," the government concedes in its brief that the violation is punishable in Israel by only three years imprisonment. Under Article II of the treaty, persons sought for conspiracies, attempts, and certain enumerated substantive crimes are extraditable only if such conspiracy, attempt, or crime is "punishable under the laws of *both* Parties by a term of imprisonment *exceeding* three years," (emphasis added) and thus this violation is not itself extraditable. The count also charged, however, a "conspiracy to commit a felo-

16. Crimes deemed "political" in character are generally not extraditable, either because of a specific provision in a treaty, see, e. g., the Treaty with Israel, Article VI, or as a matter of sovereign discretion, see Hyde, International Law 572 (1922). While Shapiro has stated that his uncle is a well-known political figure in Israel,

thus implying a political motivation for his prosecution or extradition, Judge Pollack concluded that "it has not been credibly established that the Charge or the purpose of the extradition is political in character," 352 F.Supp. at 644, and Shapiro has not attacked that conclusion here.

ny," which is punishable in Israel by more than three years. Shapiro demonstrates convincingly that under the law of New York a conspiracy to commit the particular felonies here involved would be punishable by less than three years, and argues that he thus cannot be extradited for this offense.[17] However, this fails to recognize that in limiting extraditable conspiracies and attempts to those punishable by more than three years, the applicable paragraph of the Treaty refers not to "the laws of the place where the person sought shall be found," as when defining the standards for assessing the probability that the extraditee committed the act, but to "the laws of both *parties*." (Emphasis added.) Since the United States rather than New York is a party to the Treaty, the Treaty impels us to look to the laws of the federal government, 18 U.S.C. § 371, under which a conspiracy to commit a felony is punishable by five years imprisonment.[18]

*Counts two through seventeen.* These counts charge separate factual events or series of events, each typically based upon the testimony or statement of a separate individual alleged to have been defrauded by Shapiro and/or Blumberg. Each count charges first that the events related constitute "deceit under aggravating circumstances." As to this offense, Shapiro concedes that the crime is punishable under both the laws of Israel and of New York. The counts also charge a commission of "forgery" or of "use of a forged document." Neither the events alleged in the charges nor those mentioned in the testimony of the alleged victims, however, constitute crimes of forgery as that offense is defined in New York. See N.Y.Penal Law, Art. 170, "Forgery and Related Offenses." An essential element of forgery under New York law is that the defendant use or make an instrument which "purports to be an authentic creation of its ostensible maker or drawer, but which is not either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof." N.Y.Penal Law § 170.00(4). A characteristic example of the acts alleged to have been committed by Shaprio, however, is the following (taken in this instance from Count One, to which the other counts refer): "By printing, signing and uttering letters of guarantee on forms with the said heading [of Otzar Merkazi], the accused persons made forged documents, purporting to be what they were not and likely to mislead; and they used the same with intent to defraud." It is clear from this charge and from the facts as stated above that neither Shapi-

17. The felony of deceit, or larceny by false pretenses, is a Class D felony in New York, N.Y.Penal L. § 155.35, McKinney's Consol.Laws, c. 40. A conspiracy to commit a Class D felony is Conspiracy in the Third Degree, itself a Class A Misdemeanor, N.Y.Penal L. § 105.05, for which the maximum sentence is one year, N.Y.Penal L. § 70.15(1).

Judge Gurfein, while not disputing this analysis, declined to rule the conspiracy charge not extraditable on the ground that "where the substantive offense is charged as well, there is no reason either in logic or in the literal language to require the demanding country to drop the conspiracy count." The Treaty, however, quite clearly treats conspiracies as crimes which must be separately extraditable. See Article II, which states that attempts and conspiracies are extraditable "provided such attempts or such conspiracy are punishable under the laws of both Parties by a term of imprisonment exceeding three years."

18. Although the question of whether federal or state law should serve as referent in determining the gravity of a conspiracy or attempt was argued below, neither counsel has brought to our attention any case dealing with interpretation of a similar provision, nor have we found one. However, reference to state law for delineation of the substantive elements of a crime and to federal law—when there is some—as a gauge for its gravity appears to us quite reasonable. While state law is more likely than federal to provide criminal provisions by which complementarity can be assessed, see note 4 *supra*, the makers of the Treaty might well have desired that, where possible, a uniform standard should determine the relative gravity of an offense.

ro nor Blumberg is charged with misrepresenting the authenticity of the documents in question, since the documents purporting to be letters of guarantee from Otzar Merkazi were, in fact, letters of guarantee from Otzar Merkazi, an actual organization. Their crime was rather one of misrepresenting the nature of that entity; such an offense sounds in deceit, also charged, but not in forgery.

 The Government does not dispute this reasoning, but attempts to avoid the force of the argument by citing language in Factor v. Laubenheimer, 290 U.S. 276, 301, 54 S.Ct. 191, 78 L.Ed. 315 (1933), which is claimed to overrule earlier assumptions that the principle of "double criminality" [19] would be enforced by American courts absent contrary provisions in that regard. The Government contends that the fact that the acts are not criminal as forgery in New York is thus irrelevant. We do not read Factor so broadly.[20] The Court noted that an article of the treaty with Great Britain there in question "singles out for exceptional treatment certain of the offenses named, which in terms are brought within the obligation of the treaty only if they are made criminal by the laws of both countries," 290 U.S. at 290, 54 S.Ct. at 194, thus inferring that the makers of the treaty did not intend the requirement of double criminality to apply to crimes not thus singled out. Beyond that, the Court was concerned that an opposite ruling "would restrict the reciprocal operation of the treaty," 290 U.S. at 300, 54 S.Ct. at 198, since, while Great Britain had a unified body of law under which criminality might be assessed, a culprit seeking asylum in the United States might easily find a single state having laws differing from the vast majority and attempt to have his criminality measured against this atypical example. Indeed, the Court mentioned that the crime "with which petitioner is charged is a crime under the law of many states," although not that of Illinois where he was arrested, and was "recognized as such by the jurisprudence of both countries." Id. at 299, 54 S.Ct. at 197. New York's definition of forgery, however, is not at variance with that of its sister states nor with the "jurisprudence of [this] country." See American Law Institute, Model Penal Code § 224.1(1) (Proposed Official Draft 1962); 36 Am.Jur.2d, Forgery § 6, at 684 (1968) ("As a general rule, forgery cannot be committed by the genuine making of an instrument for the purpose of defrauding."). As this circuit has recognized since Factor, at least the broad elements of double criminality here outlined ordinarily remain a prerequisite for extradition. United States ex rel. Rauch v. Stockinger, 269 F.2d 681 (2 Cir. 1959).[21] Thus, since the

19. See note 12 supra.

While a provision specifically requiring extradition for listed offenses "only if they are punishable as crimes or offenses by the laws of both countries" has been included in treaties signed by the United States, see 6 Whiteman, supra, at 774, the present Treaty has none. The provision in Article V of the Treaty that "extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found . . . to justify his committal for trial if the offense of which he is accused has been committed in that place" might appear to embody or refer to the rule. However, in Factor v. Laubenheimer, supra, virtually identical language was found to refer only to "the quantum of proof–the 'evidence,'" 290 U.S. at 291, 54 S.Ct. at 194, rather than to the definition of criminal acts.

20. We note in passing that the then Assistant Legal Adviser of the Department of State, writing in 1968, stated that "the requirement is generally imposed." 6 Whiteman, supra, at 773.

21. Under this view the decision in Factor is consistent with that of Wright v. Henkel, supra, which phrased the question before the Court as whether "the complaint and warrant did not charge an extraditable offense within the meaning of the extradition treaties between the United States and the United Kingdom of Great Britain and Ireland, because the offense was not criminal at common law, or by acts of Congress, or by the preponderance of the statutes of the states." 190 U.S. at 57, 23 S. Ct. at 784.

facts as charged do not make out an offense of forgery as defined in New York, Shapiro is not extraditable for that crime.

■ Counts 2, 5, 7 and 8 also include charges of "false entry in corporate documents," a crime punishable in Israel by up to 5 years imprisonment. Shapiro contends that this crime is not among the list of extraditable offenses contained in Article II of the Treaty. While no paragraph of that article lists the offense by name, under proper circumstances the Israeli offense might constitute the listed crimes of "obtaining money by false pretenses," or "fraud . . . by a director or officer of any company." However, with one exception the factual allegations contained in the charges make no mention of fraudulent conduct involving false entry; as discussed above, the frauds committed consisted essentially of misrepresentation of the status of Otzar Merkazi rather than of the authenticity of the documents or the accuracy of the information contained therein. The sole exception is Count Two, which states that a letter of guarantee given a victim "was a corporation document in which a false entry had been made with intent to defraud." However, the sole evidence tending to support the allegations in that transaction was the testimony of the alleged victim, Schlomo Yafeh, whose recorded statements contain no reference at all to falsified documents. Thus, while the offense charged might be extraditable if supported by proper charges and sufficient evidence tending to show a listed crime, no evidence of this nature was produced.

■ Counts 8 and 11 include charges of "Trickery." While an offense so named might constitute an offense under the laws of New York,[22] the certified translation of Israeli law in the record contains no translation of the applicable criminal provision, nor has the government offered proof of such law by any other method, see, e. g., Proposed Amendment to F.R. Crim.P. 26.1. Thus, we are unable to judge whether a complementary crime exists in the law of New York or of the United States generally, nor can we assess the sufficiency of the evidence as to this offense. Shapiro is not extraditable on this charge.

■ *Count eighteen.* The last two counts refer to a separate criminal transaction. According to the testimony of one Meir Shatsdrovitski, an employee of the Bank Agudat Israel, Ltd., Blumberg and Shapiro attempted to avoid or delay payment on a check overdrawn on the Agudat Bank by paying Shatsdrovitski to destroy the check after arrival in the Bank before the lack of sufficient funds was discovered. The count first charges that these acts constituted the crime of theft. Judge Gurfein found that this alleged offense was not extraditable since the petition for extradition was filed more than two years after the date of the alleged offense, at which point the New York statute of limitations would have run.[23] While the "inveterate and certain" rule is that an appellee who has not filed a notice of cross appeal may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary," Morley Construction Co. v. Maryland Cas. Co., 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937); Note, 51 Harv.L.Rev. 1058 (1938), we are reluctant to shield this question from scrutiny. Judge Gurfein, while discussing the question and concluding in Shapiro's favor, did not enter an order barring prosecution for this offense, and there was thus no adverse decree from which the Government could appeal. Moreover, the Supreme Court

---

22. See note 13 *supra.*

23. Article VI, paragraph 3 of the Treaty provides that extradition shall not be granted "[w]hen the prosecution or the enforcement of the penalty for the offense . . . would be barred by lapse of time according to the laws of the requested Party had the offense been committed in its territory."

has admonished that "[t]he ordinary technicalities of criminal proceedings are applicable to proceedings in extradition only to a limited extent," Wright v. Henkel, *supra*, 190 U.S. at 57, 23 S.Ct. at 785, and under these circumstances our obligation to implement the Treaty obligations and to avoid the embarrassments which might arise from leaving intact a correctable error outweigh the usual considerations in requiring a cross appeal. For a number of reasons we are unpersuaded by the judge's disposition. Judge Gurfein concluded that a two-year statute of limitations applied rather than the five-year limitation applicable to a "felony" on the ground that the check destroyed by Shatsdrovitski was "worthless" and thus the theft was only a "petit larceny." While the check was drawn on insufficient funds, it was not necessarily worthless since it undoubtedly still constituted an enforceable debt between the drawer and the payee, cf. N.Y.U.C.C. §§ 3–413, 3–306, and, since the check was drawn in the amount of 315,000 Israeli Pounds, worth roughly $90,000, it would be speculative in the extreme to determine that the value of the property stolen was less than $250. Theft of property of more than $250 in value constitutes Grand Larceny in the Third Degree in New York, N.Y.Penal L. § 155.30, for which the statute of limitations is five years. Also, since the Treaty provision refers to prosecutions time-barred by "the laws of the requested *Party*," (emphasis added), it might be proper to look to federal, rather than state law, under which the limiting period is one of five years. 18 U.S.C. § 3282.

This count also contains charges of a conspiracy to commit a felony and a conspiracy to defraud. As discussed above with respect to Count One, a conspiracy to commit a felony is an extraditable of-fense, while the conspiracy to defraud fails to meet the requirement that the offense be punishable by more than three years imprisonment under the laws of both parties.[24]

*Count nineteen.* The factual recitation in this count relates an attempt by Shapiro and Blumberg to induce Meir Shatsdrovitski to alter his explanation as to the destruction of the overdrawn check. According to Shatsdrovitski's account, the two accused approached him after the affair had been discovered and urged him to tell the police that he had destroyed the check under orders from a superior in his bank. For this Shapiro is charged with three violations. First, he is charged with the substantive offense of "giving false information." While no crime listed in Article II of the Treaty directly corresponds to a crime of this name, under certain circumstances such a crime might constitute the listed crimes of "perjury" or "false swearing." However, an essential element of those crimes under the law of New York is that the false statement be made under oath, N.Y.Penal L. § 210.00(5), and no allegation of an oath is either expressly or even inferentially made in the charging papers. The second violation charged, an "attempt to procure to [sic: "the"] commission of offense," refers to an attempt to commit the crime of "giving false information," and thus falls for want of a substantive crime cognizable under the laws of New York.

The third violation, "harassment of witnesses," is not, even by a liberal reading of the crimes listed, included among the extraditable crimes contained in Article II.

## IV. *Sufficiency of the Evidence*

As stated above, our function on review of the dismissal of a habeas peti-

---

24. As to the final charge in the count, of "concealment with intent to deceive," Judge Gurfein ruled that the crime was not an extraditable offense under the category of offenses listed in the Treaty. Since no proof of the elements of the crime under Israeli law was offered, we are unable to conclude whether the crime would be cognizable under another name, and thus Shapiro is not extraditable for that offense.

tion is limited to determining whether the magistrate had "any" competent evidence to support his finding, Fernandez v. Phillips, *supra*, 268 U.S. 311, 45 S.Ct. 541. Here, the petitioner has successfully demonstrated that the magistrate took an overly restrictive view of the scope of his powers and failed to examine the sufficiency of the evidence as to each offense charged. See note 9, *supra*. Thus, he urges, we should order his discharge unless the Government seeks a rehearing before the magistrate on the sufficiency of the evidence in each particular offense. See Application of D'Amico, 185 F.Supp. 925, 931 (S.D. N.Y.1960), appeal dismissed, 286 F.2d 320 (2 Cir. 1961).

An examination of the record and of Judge Pollack's opinion, however, convinces us that such a "remand" is unnecessary. While Judge Pollack did not examine each count and the violations charged therein, he did review the evidence demonstrating the general scheme pursued by Shapiro and Blumberg and, as shown by his summary of that scheme quoted above, he credited this evidence to a considerable extent. Since his view of the general scheme and conspiracy was based on assessment of the individual instances of fraud, to conclude that a finding of sufficient evidence as to the whole did not imply a similar finding as to the constituent parts would needlessly exalt form over substance.[25]

Shapiro argues, however, that as to a number of the individual offenses charged the record does not contain *any* evidence of his wrongdoing. He notes that only five of the alleged victims whose statements are recorded mentioned having had any direct business contacts with Shapiro, and a number of the others expressly stated that "Shapiro did not speak to me at all," or "I did not know Shapiro at all." As Judge Pollack noted, however, under

New York law a conspirator is liable as an accomplice or principal for the criminal acts committed by his co-conspirators in furtherance of the conspiracy, even if he took no part in the actual culmination. People v. Collins, 234 N.Y. 355, 137 N.E. 753 (1922); cf. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 993–1000 (1959). Since a conspiracy was both charged and demonstrable, Judge Pollack was entitled to infer that acts committed by Blumberg seemingly in furtherance of the conspiracy could be imputed to Shapiro as well. This inference is strengthened by comments by many (although not all) of the alleged victims that Shapiro was physically present or nearby during the perpetration of many of the allegedly fraudulent statements by Blumberg.

To summarize and conclude: We find Shapiro to be extraditable to Israel for prosecution for the following offenses and only for these: Conspiracy to commit a felony as charged in Count One; deceit under aggravating circumstances as charged separately in Counts Two through Seventeen; theft and conspiracy to commit a felony as charged in Count Eighteen.

There remains a question how we should give effect to this determination. The certification to the Secretary of State is made by the magistrate; the *habeas* judge cannot alter this but can only release the petitioner if he finds there is no legal ground for holding him, not at all the case here. A suitable method of disposition would thus be to modify the order of the district court here under review to provide for discharge of the petitioner unless Judge Pollack or some other magistrate designated under 18 U.S.C. § 3184 certifies within thirty days his extraditability in accordance with this opinion. As so modified the order is affirmed. No costs.

25. With respect to the crime of "false entry in corporate documents" charged in Count 2, we have in Part III already made a determination that the record provides *no* evidence tending to show that the crime had been committed by Shapiro.