**HU YAU–LEUNG, Petitioner,**

v.

**Louis SOSCIA, United States Marshal, Eastern District of New York, having the custody of the petitioner under the authority of a requested extradition by the Crown Colony of Hong Kong, Respondent.**

No. CV–80–2203.

United States District Court, E. D. New York.

Nov. 17, 1980.

Federal Defender Services Unit, The Legal Aid Society, for petitioner; Marion Seltzer, Brooklyn, N. Y., of counsel.

Edward R. Korman, U. S. Atty., Eastern Dist. of N. Y., Brooklyn, N. Y., for respondent; Ben Wiles, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

A writ of habeas corpus is sought to obtain the release of Hu Yau–Leung, a minor, being held for extradition to Hong Kong pursuant to a treaty between this country and the United Kingdom. He is a British subject and former Hong Kong resident living in the United States with his parents, who are permanent resident aliens. The Treaty on Extradition requires that the acts committed abroad constitute a felony under both American and Hong Kong law. Extradition is opposed on the ground that the petitioner would not be subject to a felony prosecution in the federal courts had the alleged acts been committed here, but that he could only be adjudicated a juvenile delinquent. In this proceeding of apparent first impression, petitioner's contentions are sustained.

### I. FACTS

Hu Yau–Leung, now seventeen years old, left Hong Kong for the United States on February 15, 1980. On June 13, 1980, in response to a request by the United Kingdom, he was arrested in the United States in anticipation of his extradition. 18 U.S.C. §§ 3184, 3187.

At an extradition hearing before a magistrate it was established that a warrant of arrest was issued in Hong Kong on June 2, 1980, charging Hu Yau–Leung with participation in two robberies in violation of Section 10(1) of the Theft Ordinance of Hong Kong, denominating such activities as felonies. Cap. 210, Laws of Hong Kong. The robberies are said to have involved forcible entry into residential apartments, the brandishing of knives and the binding and gagging of the victims. At the time of the alleged robberies, petitioner was sixteen years old. A Certification of Extraditability and Order of Commitment was issued on July 24, 1980; it provided for petitioner's return to Hong Kong upon the issuance of an extradition warrant by the Secretary of State. 18 U.S.C. § 3184.

Petitioner's parents have been living in this country for some years employed steadily as servants by employers who speak highly of them and describe a close and loving relationship among Hu, his sister and their father and mother. Since coming to this country the boy has lived with his parents and sister, has gone to public school where his adjustment is good, and has made friends among his contemporaries. He is a well built, handsome young man, mature for his age, who appears to have superior intelligence and who has, obedient to the wishes of his parents, concentrated on school, returning home each evening to study. There is no hint of any delinquency on his part since he arrived in this country.

### II. JURISDICTION

A district court's power to review the extradition decision of the magistrate is limited to three issues: (1) whether the magistrate had jurisdiction; (2) whether the offense on which extradition has been sought is within the terms of the applicable treaty; and (3) whether the evidence warranted a finding that there was reasonable ground to believe the accused guilty of the offense charged. *See, e. g., Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Shapiro v. Ferrandina*, 355 F.Supp. 563, 567 (S.D.N.Y.), *mod. and aff'd*, 478 F.2d 894 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). This petition raises the second of those questions–whether the offense on which extradition has been sought is within the terms of the Treaty on Extradition between the United States and the United Kingdom.

### III. TREATY

The Treaty on Extradition between the United States and the United Kingdom was signed in London in 1972 and in Washington in 1976; it entered into force in

1977. 28 U.S.T. 227, T.I.A.S. 8468. Following the pattern of most of our extradition treaties, this Treaty enumerates those offenses which will be deemed sufficient to support extradition and requires that both countries regard the offenses as criminal. The principle is known to international law as "double criminality"; it was explicitly endorsed by the negotiators of this treaty in the minutes of their negotiations. Feb. 5, 1970 Minutes, p. 3. Thus, Article III provides that:

(1) Extradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, or any other offense, if:

(a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty;

(b) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub–paragraph (1)(a) of Article II; *and*

(c) *the offense constitutes a felony under the law of the United States of America.*

(Emphasis added.)

Since a felony is defined by United States law as "Any offense punishable by death or imprisonment for a term exceeding one year" (18 U.S.C. § 1), some analysis of the history and purpose of subsection (c) of Article III is required if it is to have a meaning that is not merely duplicative of that of subsection (a).

Extradition treaties between sovereign nations have been negotiated with regularity since the eighteenth century, though such "international cooperation in the suppression of crime" can be traced as far back as the peace treaty signed by the Hittite ruler, Hattusili III and Rameses II of Egypt in the thirteenth century B.C. I. A. Shearer, *Extradition in International Law* 5, 7, 16, 23 (1971). Throughout history, such treaties have typically reflected what extradition scholars have called "the basic rule" and an "essential ingredient" of extradition,

the double criminality principle. S. D. Bedi, *Extradition in International Law and Practice* 179 (1966); Shearer at 137. This rule, embodied in Article III of this Treaty between the United States and the United Kingdom,

requires that an act shall not be extraditable unless it constitutes a crime according to the laws of both the requesting and the requested States.... [I]t serves the most important function of ensuring that a person's liberty is not restricted as a consequence of offenses not recognized as criminal by the requested State.

Shearer at 137–38 (footnote omitted).

The Second Circuit has emphasized the centrality of double criminality to proper extradition practice. *Shapiro v. Ferrandina*, 478 F.2d 894, 911 (2d Cir. 1973), *modifying and aff'g* 355 F.Supp. 563 (S.D.N.Y. 1973). It has phrased the requirement as demanding that "the offense for which a person is extradited ... be punishable as such under the laws of both the requesting and the requested nation...." 478 F.2d at 906 n. 12.

An examination of other treaties of the United States throws little light on the issue before us of how juveniles should be treated. Some, like the treaty with the United Kingdom, contain no explicit reference to the age of the person sought to be extradited. *See, e. g.*, Mexico (1978) 15 I.L.M. 634; Australia (1976) T.I.A.S. 8234; Bahamas (1978) T.I.A.S. 9185. Others do refer specifically to the extradition of juveniles. For example, the treaty between the United States and Spain (1971) provides:

Article VI. If a request for extradition is made under this Treaty for a person who at the time of such request is under the age of eighteen years and is considered by the requested Party to be one of its residents, the requested Party, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting Party that the request for extradition be withdrawn, specifying the reasons therefor.

22 U.S.T. 737 at 741. That between the United States and Finland (1980) contains a virtually identical provision, Article 8, T.I. A.S. 9626, as does the one between the United States and Canada (1976), Article 5, T.I.A.S. 8237. Extradition between the United States and Norway (1980) is governed by a similar formulation providing, in Article 7, that

> [e]xtradition may be refused ... [i]f, in special circumstances, having particular regard to the *age*, health or other personal conditions of the person concerned, the requested State has reason to believe that extradition will be incompatible with humanitarian considerations.

T.I.A.S. 9779. (Emphasis added.) Virtually identical provisions appear in the treaties on extradition between the United States and Sweden (1961), Article 6, T.I.A.S. 5496, 14 U.S.T. 1845, 1849, and between the United States and Denmark (1974), Article 7, T.I.A.S. 7864, 25 U.S.T. 1293.

It is apparent from these other treaties that had this government wished to address the problem of treatment of juveniles it could have readily done so. No legislative history bearing on this issue has been furnished by either side. Silence on the point has created an ambiguity which must be resolved by the courts.

## IV. CONTROLLING LAW

### A. *Federal*

█ While not all the cases are consistent, as a general matter the phrase in the Treaty, "a felony under the law of the United States of America," refers to federal law. *See* 18 U.S.C. § 3185 (listing "offenses" subject to extradition). Though there may be instances where state law may be treated as the law of the United States under the assimilative crimes act, 18 U.S.C. § 13, or where the federal law is silent, if the United States statutes deal with the matter in issue federal law controls. *See, e. g., Shapiro v. Ferrandina*, 478 F.2d 894, 910 n. 18 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973) (endorsing reference "to federal law—when there is some—as a gauge for [the] gravity" of the offense for which extradi-

tion is sought); *Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 n. 1 (5th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (federal not state statute of limitations controls); *United States ex rel. Sakugucki v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975) (national not state law "sets the standard" to determine sufficiency of evidence); *Freedman v. United States*, 437 F.Supp. 1252, 1259–60 (N.D.Ga.1977) (examining both state and federal law in determining what is "bribery" despite slightly more ambiguous language in Webster–Ashburton Treaty with Canada). *Cf. Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922) (Louisiana law relied upon, "But no procedural rule of a state could give to a prisoner the right to introduce evidence made irrelevant by a treaty."); *Pettit v. Walshe*, 194 U.S. 205, 217, 24 S.Ct. 657, 48 L.Ed. 938 (1904) (state law applicable for the purpose of assessing the probability of whether the person sought to be extradited committed the acts charged, there being no federal common law of crimes); *Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903) (same); *Muller's Case*, Case No. 9,913, 17 Fed.Cases 975, 976 (E.D.Pa.1863) (in absence of United States law, law of state where person is found applies).

The reason for reliance on federal law wherever that is possible rather than on the diverse law of the states is obvious. A foreign government has good reason to expect a uniform rule in the federal courts, without respect to venue. Reliance on local practice would import too much uncertainty into national extradition policy embodied in treaties, given the great diversity in the juvenile laws of the states. For much the same reason, varying state laws of adultery could not interfere with "the necessity of providing a relatively uniform administration of the naturalization law" of the United States. *In re Johnson*, 292 F.Supp. 381, 384 (E.D.N.Y.1968). *See also, In re Bayer*, Pet. No. 734865, p. 4 (E.D.N.Y.1972) ("Weight must be given to the constitutional mandate to establish a uniform rule of naturalization."); *cf.* Hill, State Procedural Law in Federal Diversity Litigation, 69

Harv.L.Rev. 66, 104 (1955) ("interest in a national uniformity in the administration of federal statutes").

Inapposite is the government's reliance on state cases in which extradition to another state was granted even though the juvenile court laws of the extraditing state would not have permitted a child of like age to be criminally charged. *Snyder v. State*, 95 Idaho 643, 516 P.2d 700 (1973); *People v. Pardo*, 47 Ill.2d 420, 265 N.E.2d 656 (1970), *app. dismissed*, 402 U.S. 992, 91 S.Ct. 2179, 29 L.Ed.2d 158, *cert. denied*, 403 U.S. 941, 91 S.Ct. 2260, 29 L.Ed.2d 721 (1971); *Ex parte Leatherwood*, 148 Tex.Cr.R. 515, 188 S.W.2d 581 (1945); *contra People v. Butts*, 14 N.Y.S.2d 881, 173 Misc. 1061, 18 N.Y.S.2d 696 (Queens Co.1939). None of the state cases offers guidance since the practice of interstate extradition has only the most attenuated relevance to the issue of extradition between sovereign nations. *See, e. g.*, *Biddinger v. Commissioner*, 245 U.S. 128, 132, 38 S.Ct. 41, 42, 62 L.Ed. 193, 198 (1967) (state extradition practice different from international practice).

Interstate extradition does not find its basis in treaties between pairs of states but in Article IV, section 2, clause 2 of the Constitution which provides that:

A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State shall on Demand of the Executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

That clause contains no requirement that the offense be considered criminal by both the requesting and the requested states and so imposes no limitation analogous to that imposed by the Treaty.

We have found no case suggesting that juvenile policies of the United States should be ignored in foreign extradition proceedings. They reflect a deeply rooted substantive decision on the part of American jurists and legislators not to treat juveniles as criminals.

### B. Current Law

The meaning of the term felony will change as the statutory policy of the United States is modified by adding or subtracting from those events included within the definition of a felony. *Muller's Case*, No. 9,913, 17 Fed.Cases 973, 977 (E.D.Pa.1863). We turn then to the United States statutes to determine whether, if a person in petitioner's class had been prosecuted in United States courts, he could have been properly charged with a felony.

## V. FEDERAL LAW GOVERNING JUVENILES

The Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042 (and the overwhelming majority of state juvenile justice laws), takes scrupulous precautions to ensure that adjudications of delinquency for acts by children are not deemed criminal—let alone felony—convictions; that proceedings under such statutes are civil, not criminal in nature; and that a juvenile is not "imprisoned" even after being found to be delinquent.

Consequences of juvenile delinquency adjudications are essentially different from those resulting from conviction for a felony. It is therefore not a mere matter of semantics to find that Hu Yau–Leung's actions would not have constituted a felony under the laws of the United States. Such a finding is required by the determination of American law not to brand children as criminals.

### A. Juvenile Delinquency Act

The main statutory embodiment of federal juvenile delinquency policy is the Federal Juvenile Delinquency Act. 18 U.S.C. §§ 5031 *et seq.* (1974). It reflects at least four decades of effort by reformers in and out of Congress to fashion an adjudication system for juveniles which has as its goal rehabilitation rather than punishment. *See, e. g.*, White House Conference on Child Health and Protection, Committee on Socially Handicapped, *The Delinquent Child* 541 (1932) (describing the aim of the juvenile court system as "safeguarding instead

of punishing the child"); *cf. e. g.*, Report of Joint Legislative Committee on Court Reorganization, The Family Court Act, 1962 McKinney's Sessions Laws 3428, 3433–34.

"Juvenile delinquency" is defined as the "violation of a law of the United States committed by a person prior to his eighteenth birthday *which would have been a crime if committed by an adult.*" 18 U.S.C. § 5031 (emphasis added). Once it has been established that the appropriate state court does not have, or refuses to exercise, jurisdiction over the juvenile qua juvenile, or does not have adequate programs in which he might be placed, the federal district court assumes jurisdiction. 18 U.S.C. § 5032.

In the case of a juvenile sixteen years or older who is alleged to have committed an act after his sixteenth birthday which would be a felony if committed by an adult and would be punishable by a maximum penalty of ten years imprisonment or more or by the death penalty, the Attorney General may ask the court to transfer the action to the conventional criminal system. 18 U.S.C. § 5032. After considering a range of factors specified in the statute— including age, background, prior delinquency record, nature of the alleged offense, and other relevant matters—in determining whether juvenile treatment is appropriate, the court decides whether such a transfer would be in the interest of justice. 18 U.S.C. § 5032. If it denies the Attorney General's motion, the minor is treated as an alleged juvenile delinquent under the Act. The relevant portion of section 5032 reads:

A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile sixteen years and older alleged to have committed an act after his sixteenth birthday which if committed by an adult would be a felony punishable by a maximum penalty of ten years imprisonment or more, life imprisonment, or death, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice.

Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.

On the assumption that the Attorney General might have moved to have a proceeding against the petitioner transferred to the conventional criminal process (a doubtful assumption on the basis of general federal practice favoring juveniles), a hearing was held to ascertain whether, in light of the factors in the statute, the interest of justice would have been served by such a transfer in petitioner's case. Based on the evidence, this court's finding is that the interest of justice would not have been so served and that petitioner would not have asked to be, or have been treated as an adult. *See United States v. E. K.*, 471 F.Supp. 924, 931–33 (D.Or.1979). It has been established beyond a reasonable doubt that petitioner would have been proceeded against in the United States courts as an alleged juvenile delinquent, rather than as an alleged adult felony offender.

Had Hu Yau–Leung been adjudicated a delinquent after a disposition hearing he could have been placed on probation or committed to the custody of the Attorney General. 18 U.S.C. § 5037. Records of the adjudication would have been sealed. 18 U.S.C. § 5038. Upon "application for employment, license, bonding, or any civil right or privilege," the adjudicated delinquent could have answered as if he had "never been involved in a delinquency pro-

ceeding"—i. e., as if he had an unblemished record. 18 U.S.C. § 5038. Special precautions would have been taken to ensure that he would not be incarcerated "in an adult jail or correctional institution;" instead a foster home or community based facility would have been utilized. 18 U.S.C. § 5039. Based upon the practice in this district, Hu Yau–Leung would have been granted probation or, at worst, he would have been placed in a local noncorrectional educational facility or foster home.

## B. *Congressional and General American Policy*

The Act, originally passed in 1938, amended in 1948 and again, substantially, in 1974, has been described consistently by its authors and by the courts as providing a non–criminal process for adjudicating juveniles and as resulting in an adjudication of a status and not in a conviction for a crime. In 1938, both the Senate and House reports accompanying this first comprehensive federal program for the care and treatment of juvenile delinquents reprinted a letter from the Attorney General describing the purposes of the new legislation:

> Students of criminology and penology generally agree that it is undesirable, from the standpoint both of the community and of the individual that all juvenile offenders be treated as criminals. Many of them can be reclaimed and made useful citizens if they are properly treated and cared for, and are not permitted to mingle with mature and perhaps hardened criminals. In order to achieve these purposes it is important that juvenile offenders should not become inmates of penitentiaries and other penal institutions in which adults are incarcerated. It is likewise advisable that a juvenile delinquent should not receive the stigma of a criminal record that would attach to him throughout his life.

H.R.Rep.No.2617, 75th Cong., 3d Sess. 2 (1938); S.Rep.No.1989, 75th Cong., 3d Sess. 1 (1938). In 1948, Sections 5032 and 5033 were rewritten, according to the Historical and Revision Notes "to make clear the legislative intent that *a juvenile delinquency proceeding shall result in the adjudication of a status rather than the conviction of a crime."* 18 U.S.C.A. § 5033 (1969) (emphasis supplied).

Changes in the Act over the years have concentrated on incorporating due process safeguards which were originally thought to be unnecessary under the *parens patriae* theory of the juvenile courts. S.Rep. 93–1011 on Pub.L.No.93–415, 1974 U.S.Code Cong. & Ad.News, p. 5283, 5312; *see also,* W. T. Pink & M. F. White, *Delinquency Prevention: The State of the Art* in The Juvenile Justice System, Vol. V: Sage Criminal Justice Annuals (M. W. Klein ed. 1976). Recently, added protections have been mandated by the Supreme Court. *See, e. g. In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). And Congress has made juvenile treatment presumptive, rather than discretionary with the Attorney General. Pub.L.No.93–415, Title V, § 502, 88 Stat. 1134 (amending 18 U.S.C. § 5032).

These changes have strengthened the policy favoring non–criminal adjudications. *In re Gault,* 387 U.S. 1, 22, 87 S.Ct. 1428, 1441, 18 L.Ed.2d 527 (1967) ("the features of the juvenile system which its proponents have asserted are of unique benefit will not be impaired by constitutional domestication"); S.Rep. 93–1011, 1974 U.S.Code Cong. & Ad. News, p. 5312 (1974) (changes "guarantee certain basic procedural and constitutional protections to juveniles under federal jurisdiction [while] provid[ing] for the unique characteristics of a juvenile proceeding ...."). They have not disturbed the long-standing legislative and judicial view that an adjudication under the Act is not a conviction for a crime.

 The fact that the Treaty was negotiated before (though signed after) the 1974 amendments in no way affects the legislative policy that the Act has always embodied. The courts have been virtually unanimous in their reiteration of the formulation that an adjudication of delinquency is not a conviction for a crime. *United States v. E. K.,* 471 F.Supp. 924, 929 (D.Or.1979) ("an adjudication of delinquency ... is a determination of a status, and not a conviction of a crime"); *United States v. Hill,* 538 F.2d 1072, 1074 (4th Cir. 1976); *United States v.*

*Caniff*, 521 F.2d 565, 569 n. 2 (2d Cir. 1975), *cert. denied sub nom. Benigno v. United States*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. King*, 482 F.2d 454, 456 (6th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973); *United States v. Hoston*, 353 F.2d 723, 724 (7th Cir. 1965); *Fagerstrom v. U. S.*, 311 F.2d 717, 720 (8th Cir. 1963); *United States v. Kinsman*, 195 F.Supp. 271, 273 (S.D.Cal.1961); *United States v. Sprouse*, 145 F.Supp. 292, 293–94 (N.D.Fla.1956).

Thus, for example, in the course of holding that prior state youthful offender adjudications cannot be used for impeachment purposes under federal law, the Second Circuit wrote in *United States v. Caniff* that the "purpose of a federal juvenile delinquency proceeding . . . is to avoid the stigma of a prior criminal conviction . . ." 521 F.2d at 569. Describing the procedure under the Federal Juvenile Delinquency Act, it concluded that "no criminal prosecution is instituted against the young person . . . and the ultimate adjudication is not a criminal conviction." *Id.* at 569 n. 2. "Not only is § 5031 not a felony . . . it does not describe a crime of any kind." *United States v. Kinsman*, 195 F.Supp. 271, 273 (S.D.Cal. 1961). The consequences of an adjudication of juvenile delinquency under the Act differ essentially from those flowing from a conviction of crime, and the provisions of the statute themselves make clear "its purposes to be helpful and rehabilitative rather than punitive." *United States v. Hill*, 538 F.2d 1072 (4th Cir. 1976). *See also,* Rule 609(d), Federal Rules of Evidence, approved by Congress effective 1975 (excluding juvenile adjudications for purposes of impeachment). As the court noted in the leading case of *Thomas v. United States*, 121 F.2d 905, 907–909 (D.C.Cir.1941), juvenile offender statutes are:

> founded upon strong social policy, and their aim is amnesty and oblivion for the transgressions of youthful offenders. The fundamental philosophy of the juvenile court laws is that a delinquent child is to be considered and treated not as a criminal but as a person requiring care, education and protection. . . . Thus, the primary function of juvenile courts . . . is

not conviction or punishment for crime, but crime prevention and delinquency rehabilitation. It would be a serious breach of public faith, therefore, to permit these informal and presumably beneficent procedures to become the basis for criminal records, which could be used to harass a person throughout his life.

(Footnotes omitted.)

This philosophy has been echoed and reaffirmed by the recently published recommendations of the Juvenile Justice Standards Project of the Institute of Judicial Administration–American Bar Association Joint Commission on Juvenile Justice Standards. In its *Standards Relating to Adjudication* 67 (1977) (tentative draft), the Project proposed as standard 5.3(A):

> Each jurisdiction should provide by law that a juvenile court adjudication is not a conviction of crime and *should not be viewed to indicate criminality for any purpose.*

(Emphasis added.) Standard 5.3(A) was approved by the American Bar Association in 1979. The Commentary declares:

> Juvenile court legislation typically contains declarations that an adjudication by the juvenile court is not a conviction of crime and does not impose any of the disabilities normally imposed by a criminal conviction. Such provisions are central to the policy decision providing a separate juvenile court process . . . [and appear in some form] in virtually all juvenile court legislation. . . .

*Id.* at 68–69. The law of the United States regards the same act committed by a child on the one hand and an adult on the other as fundamentally different in nature and as thus deserving of different treatment.

Since it cannot be denied that sending Hu Yau–Leung from his home in the United States to face adult charges in Hong Kong would be a "disability" and "stigma" of the highest order, it is clear that the strong policy of the United States would be offended by extradition.

**1390**

## CONCLUSION

The juvenile justice laws of the United States must be considered in determining whether the acts with which Hu Yau–Leung stands accused in Hong Kong constitute a "felony" as required by Article III of the Treaty on Extradition between the United States and the United Kingdom. United States law and practice would preclude finding the petitioner guilty of a felony. Accordingly, the requirement of the Treaty has not been satisfied. Should Congress wish to change this result, a simple amendment to the Federal Juvenile Delinquency Act will suffice.

When there is an ambiguity in the law leaving it unclear whether Congress intended liberty or incarceration, our jurisprudence requires an interpretation favoring freedom. When uncertainty in the law permits either an interpretation which would allow a minor to remain in this country with a loving family and friends or one which would direct that he be deported to face criminal charges in a foreign land, the law's good sense instructs us to lean towards mercy.

The writ is granted. Extradition is denied.

So ordered.