HU YAU–LEUNG, Petitioner-Appellee,

v.

Louis SOSCIA, United States Marshal for the Eastern District of New York, Respondent-Appellant.

No. 855, Docket 80–2356.

United States Court of Appeals, Second Circuit.

Argued March 16, 1981.

Decided May 26, 1981.

Ben Wiles, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for respondent-appellant.

Phylis Skloot Bamberger, New York City (The Legal Aid Soc., Federal Defender Services Unit, Marion Seltzer, of counsel), for petitioner-appellee.

Before LUMBARD, NEWMAN, Circuit Judges, and TENNEY,* District Judge.

LUMBARD, Circuit Judge:

The United States Marshal appeals from the judgment of the District Court for the Eastern District of New York, Weinstein, *Ch. J.*, granting a writ of habeas corpus and denying extradition of Hu Yau-Leung, a British subject and former Hong Kong resident now living in Brooklyn, New York. The district court held that because of Hu's age at the time of the crime for which his extradition was sought, the requirement of the applicable extradition treaty that the crime "constitute a felony under the law of the United States" was not satisfied. 500 F.Supp. 1382. We disagree, and therefore reverse the judgment and deny issuance of the writ.

I.

Hu Yau-Leung was born in Hong Kong on February 18, 1963 and left Hong Kong on February 15, 1980 and came to the United States to join his parents. In June of 1980, the United States Attorney for the Eastern District of New York, acting on behalf of the government of the United Kingdom, filed a complaint requesting issuance of a warrant for Hu Yau-Leung's arrest for his proposed extradition. The warrant was issued, and an arrest was made. After two hearings before a United States Magistrate to determine extraditability, a Certification of Extraditability and Order of Commitment was issued providing for Hu Yau-Leung's return to Hong Kong upon the issuance of an extradition warrant by the Secretary of State.

Extradition had been sought because on June 2, 1980, Hong Kong authorities issued a warrant for Hu's arrest. In the warrant, Hu was charged with participation in two robberies, each in violation of Hong Kong law. The first robbery occurred on January 30, 1980 when three men armed with knives

---

* Honorable Charles H. Tenney of the United States District Court for the Southern District of New York, sitting by designation.

broke into an apartment, bound the occupants with wire and ransacked the premises. In the second robbery, on February 10, 1980, three men again armed with knives forced their way into another apartment, blindfolded and gagged the occupants and ransacked the premises. Eyewitness victims of each of the robberies identified Hu from his photograph as one of the perpetrators.

Based upon affidavits and other evidence presented, the United States Magistrate found probable cause to believe Hu had committed the crimes with which he was charged in Hong Kong. The Magistrate found that the requirements of the Treaty of Extradition between the United States and the United Kingdom, 28 U.S.T. 227, T.I.A.S. 8468 (1977) ("the Treaty"), made applicable to Hong Kong by Article II, section 2 of the Treaty and an exchange of notes dated October 21, 1976, had been satisfied and accordingly, he issued the Certificate of Extraditability.

In his habeas corpus petition, Hu sought to prevent his extradition on the ground that at the time of the robberies he was only sixteen years old. The Treaty provides for extradition only where the "offense constitutes a felony under the law of the United States." Article III(1)(c). Hu argued that there had been no such felony, since under United States law, as expressed in the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042, Hu would have been treated as a juvenile and would therefore not have been charged or convicted as a "felon."

The district court, stating that this was a difficult case of first impression, agreed with Hu's argument. The court held first that the Treaty phrase "the law of the United States" referred to federal—not state—law, and in determining whether the offense for which extradition was sought constituted a felony under federal law, the Federal Juvenile Delinquency Act had to be considered. The court stated that under the Act, where federal offenses are committed by persons under sixteen, juveniles are turned over to state juvenile programs unless the relevant state lacks or refuses to include the juvenile in an appropriate program. In that case, the district courts retain jurisdiction over the juvenile. Under the Act, according to the district court, a juvenile is not "convicted" of a crime but "adjudicated a juvenile delinquent."

However, as the district court also noted, the Act provides that for those aged sixteen to eighteen who commit crimes which would be felonies if committed by an adult, the Attorney General may order that the juvenile be subject to the same criminal penalties as an adult would be. In order to effect this "transfer to the conventional criminal justice system" a district court judge must determine whether such a "transfer" is in the "interests of justice." 18 U.S.C. § 5032. On the assumption that such a proceeding might have been initiated against Hu Yau-Leung, the district court held a hearing. At the hearing, the court determined "beyond a reasonable doubt" that Hu would not have been transferred, but would have been proceeded against as a juvenile delinquent under the Act, and would not therefore be charged with or convicted of a felony. Finally, the district court, reviewing the decisions under the Act, decided that extradition here would be contrary to the federal policies expressed in the Act.

## II.

Article III(1) of the Treaty provides that extradition will be granted if the facts disclose an offense listed in the Treaty's schedule of offenses *and*:

(a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty;

(b) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies . . . ;

(c) the offense constitutes a felony under the law of the United States of America.

The question here is whether, under subsection (c), the offenses alleged against Hu are felonies under United States law.

The parties agree that the purpose of Article III(1) was to adopt for the Treaty the principle of "double criminality" which underlies much of international extradition law. *See Minutes of Extradition Negotiations, United States-United Kingdom*, London, October 30, 1969 and December 1–4, 1969; *see generally*, 6 M. Whiteman, *Digest of International Law* § 13, at 773–79. According to that principle, extradition may be had only for offenses which are criminal under the laws of both the requesting and requested countries. Article III(1)(a) requires in addition that the crime be punishable by more than one year of detention or by death. This provision is common in extradition treaties, and is designed to assure that extradition will be allowed only for those charged with serious crimes.

Subsections (b) and (c) are relatively uncommon among extradition treaties. They appear to be counterparts. Subsection (b) allows the United Kingdom (or other territory for whom the Treaty is applicable) to adjust the list of crimes for which extradition will be allowed by amending its domestic extradition law. Just as subsection (b) would allow changes in attitude as to which crimes are of a sufficiently serious nature to warrant extraditability, subsection (c) assures the gravity of the offense under United States law and allows for changes in American law reflecting new attitudes toward the seriousness of various crimes.

The government argues that the district court was in error because the principle of double criminality as embodied in Article III(1) is concerned solely with the gravity of the crime itself and not the treatment of the particular offender. According to the government, under a double criminality standard, the test for extraditability is only whether the laws of both countries make criminal the commission of the specific acts with which the offender is charged. Thus, the government refers to the many cases in which claims by an extraditee that an alibi or other defense under American law existed have been held irrelevant to the extradition inquiry. *See, e. g., Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Collins v. Loisel*, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *U. S. ex rel. Bloomfield v. Gengler*, 507 F.2d 925 (2d Cir. 1974); *United States v. Galanis*, 429 F.Supp. 1215 (D.Conn.1977). In particular, the government points to those cases stating that even insanity, which might afford a defense to any crime under United States law, will not be considered in an extradition hearing. *See, e. g., Charlton v. Kelly, supra*, 229 U.S. at 462, 33 S.Ct. at 950; *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978); *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973). Thus the government concludes that the term "felony" in subsection (c) was intended to refer solely to whether the acts charged constituted a "felony" not whether the particular individual who committed those acts could avoid punishment for a felony on any ground, including age.

We find considerable merit in the government's argument, given the limited nature of the inquiry in an extradition hearing. We also note that many other extradition treaties,[1] as well as the present Model Treaty,[2] include separate provisions relating to the treatment of juveniles, yet none was included here. Nevertheless, we need not determine whether age is completely irrelevant, because we believe it sufficient to satisfy Article III(1), that even if Hu's age is considered, he could have been charged

1. *See, e. g.*, Art. 5 of Extradition Treaty with Canada, 27 U.S.T. 985, T.I.A.S. 8237 (1974); Art. 7 of Treaty with Denmark, 25 U.S.T. 1293, T.I.A.S. 7864 (1974); Art. 7 of Treaty with Finland, —— U.S.T. ——, T.I.A.S. 9626 (1978); Art. 7 of Treaty with Italy, 26 U.S.T. 493, T.I. A.S. 8052 (1975); Art. 6 of Treaty with Paraguay, 25 U.S.T. 967, T.I.A.S. 7838 (1974); Art. 6 of Treaty with Spain, 22 U.S.T. 737, T.I.A.S. 7136 (1971); Art. 5 of Treaty with Sweden, 14 U.S.T. 1845; T.I.A.S. 5496 (1963).

2. The Model Treaty was offered for public comment by the State Department on November 12, 1976. *See* Model Treaty on Extradition, *Federal Register* (Nov. 24, 1976), *reprinted in* 1976 *Digest of United States Practice in International Law* § 5, at 132–37. Article VII BIS contains the provision relating to treatment of juveniles.

with and convicted of a felony in the United States.

The district court held, in interpreting subsection (c), only federal law need be consulted. It therefore examined the provisions of the Federal Juvenile Delinquency Act and, upon the assumption that Hu violated a federal law, and on the further assumption that the federal courts would take jurisdiction over Hu, and finally on the assumption that Hu's "transfer" to the conventional criminal system would be attempted, it held a hearing and determined that Hu would be treated as a juvenile under federal law. We find this approach flawed for a number of reasons.

■ First, we disagree with the district court that under subsection (c) only federal law is relevant. The phrase "under the law of the United States of America" in an extradition treaty referring to American criminal law must be taken as including both state and federal law absent evidence that it was intended to the contrary. *See Wright v. Henkel*, 190 U.S. 40, 58, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903) (predecessor British extradition treaty's requirement that offense be criminal "under the law of both countries" held to refer to both federal and state law).[3] The district court apparently recognized this general view by accepting that state or federal law would determine the substantive offense, but also held that only federal law would govern the definition of a "felony." We disagree.

Only federal crimes are felonies under federal law, and therefore a reading limiting subsection (c) to federal felonies would prevent extradition for those charged with state crimes. Such a result is obviously incorrect, for in the United States most serious offenses are defined by state law, and those who commit those offenses are prosecuted by the states. The error of the district court's interpretation can also be seen in that the court was thereby forced to analyze Hu's extraditability under a law, the Juvenile Delinquency Act, which applies only to violations of federal law, and therefore would have had absolutely no bearing had Hu committed the alleged crimes in the United States (unless he committed the armed robberies on federal property).

■ The most reasonable interpretation of subsection (c) is that for conduct that would have violated any federal statute, federal law determines whether the conduct would have been a felony, and for conduct that would have violated only a state statute, state law governs the felony determination. This is consistent with the proper "double criminality" inquiry: if the individual had committed the same acts in the United States, would a crime have been committed and would it have been a felony? Nevertheless, as far as Hu is concerned the law of the state in which he was found, New York,[4] is not very different from federal law in the areas relevant to his offenses.[5]

---

3. The district court's interpretation is also contrary to the Extradition Treaty with Australia, 27 U.S.T. 957, T.I.A.S. 8234 (1976). Article II of that Treaty, in a slight variation of the British Treaty's Article III, provides for extradition in section (1) for all listed offenses punishable in both countries by more than a year of imprisonment or by death, and in section (2) for other offenses made extraditable under Australian extradition law "and which are felonies under the laws of the United States of America." Section (3), however, states that extradition will also be granted for an offense against "a *federal* law of the United States of America" where the offense is a substantial element of the crime. Thus the phrase in section (2) "felonies under the laws of the United States of America," a phrase almost identical to that in

Art. III(1)(c) of the British Treaty, was clearly intended to refer to both federal and state law.

4. Under extradition treaties, where state law applies, the law of the state in which the extraditee is found will be consulted. There may be an exception to this rule where the state law is contrary to the weight of law in other American jurisdictions, *see Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), but New York's system of juvenile justice, at least as concerns Hu, does not appear out of line with those of the other states and, as noted below, is almost identical to the federal juvenile system.

5. As noted below, as to both the definition of a felony and the treatment of juveniles, New York and federal law are quite similar. *See, e. g., United States v. Canniff*, 521 F.2d 565, 569–

As Hu is charged with forcibly stealing property while armed with a deadly weapon, his acts would amount to first degree robbery, a class B felony under New York law, carrying a penalty of up to twenty-five years of imprisonment. N.Y.Penal Law §§ 160.15, 70.00 (McKinney's 1975). New York law defines a felony as an offense punishable by more than one year of detention. *Id.* § 10.00.5. New York law provides that any person of age fourteen and over may be criminally responsible for first degree robbery. N.Y.Penal Law § 30.00.2 (McKinney Supp.1980). As a sixteen year old, who is alleged to have committed a first degree robbery, however, Hu would be considered an "eligible youth" for purposes of New York's youthful offender system. N.Y.Crim.Proc. Law § 720.10.2 (McKinney's Supp.1980). Under that system, although an "eligible youth" is charged and tried as any other accused, upon conviction, the sentencing court must order a presentence investigation. After reviewing the investigation, the court determines whether "the interest of justice would be served by relieving the eligible youth from the onus of a criminal record," and if the court so finds it treats the eligible youth as a "youthful offender." *Id.* § 720.20.1. Proceedings against eligible youths may be granted greater privacy. *Id.* § 720.15. A youthful offender adjudication "is not a judgment of conviction for a crime." *Id.* § 720.35.

■ We believe that the requirements of Article III(1)(c) are satisfied by the fact that, even considering Hu's age, he could have been charged with, convicted of,[6] and sentenced for a felony under New York law.[7] The definition of a felony under New York law, like that under federal law, *see* 18 U.S.C. § 1, is an offense punishable by more than a year of detention. Clearly, Hu's offense, even taking note of his age, falls within this certain definition, for Hu could have been so punished. This reading also comports with the structure of Article III(1), which appears concerned not with the penalties received by any criminal, but with the possible penalties, since such penalties supply a measure of the seriousness with which the crime is regarded. Thus, it has been held to be no defense, under an extradition treaty provision similar to Article III(1)(a), that the particular individual whose extradition was sought, was tried *in abstentia* in the requesting country and given a sentence for less than one year. *United States v. Clark*, 470 F.Supp. 976 (D.Vt. 1979).

Moreover, as noted earlier, we do not believe that the framers of the British Extradition Treaty intended that minitrials would be held to determine whether individuals might in some way receive more lenient treatment under the criminal law. The Treaty, like most other treaties, explicitly limits the type of hearing in the requested country to determine extraditability. Such hearings have been held to have limited scope, both as to the type of defenses which may be raised and the type of evidence which may be received. It would be contrary to this policy against protracted extraditability hearings to allow extradition courts to consider how other courts might

---

70 (2d Cir. 1975). Thus our result in this case would be the same under either law.

**6.** Indeed, under the New York procedures outlined above, Hu would have necessarily been charged with a felony and could not have avoided conviction on the basis of his age. Having been convicted, the court would then consider whether Hu was to be afforded "youthful offender" status, in which case his conviction would be substituted by a "youthful offender adjudication."

**7.** It is interesting to note that in the only reported case in which juvenile status was raised as a defense to extradition under a treaty silent on the issue, the Secretary of State permitted extradition to Canada of a sixteen and an eighteen-year-old charged with murder after ascertaining from the governor of New York that there was no age limit under which a person could not be tried for first degree murder. *See* 6 G. Hackworth, *Digest of International Law* § 338, at 190–91. It is also relevant that at the time of the extradition, 1924, extradition to Canada was governed by a predecessor to the present extradition treaty with the United Kingdom, and that the present Canadian extradition treaty contains a specific provision relating to juveniles, *see* note 1 *supra*, although the British Treaty does not.

exercise their discretion in determining whether an individual such as Hu should be treated as within a juvenile justice system.

Finally, our conclusion is buttressed by comparison with other extradition treaties of the United States. As noted earlier, many of these treaties contain special provisions relating to treatment of juveniles, yet no such provision appears in the British Treaty. This is quite striking considering that the Treaty was renegotiated at approximately the same time that the new Model Treaty on Extradition, which includes a provision for treatment of juveniles, was proposed. Moreover, these provisions are always distinct from the provisions, such as Article III(1), which set forth the double criminality principle. Thus we see no reason to interpret this Treaty's double criminality principle to exclude extradition on account of age of a person who could be treated as a felon.

In addition, except for the juvenile provisions of extradition treaties with Scandinavian countries, provisions relating to juveniles, including the one in the Model Treaty, only give the requested country discretion to recommend that the extradition request be withdrawn. The Scandinavian countries are required by their domestic extradition laws to include treaty provisions granting a requested nation absolute discretion to refuse to allow extradition on any "humanitarian" grounds, including age. Thus, aside from those treaties, even where specific provisions for treatment of juveniles are included, exemption from extradition lies only within the discretion of the executive branch, and even then, the executive is only given power to recommend that extradition not occur. It would be inconsistent then to interpret a treaty which makes no provision for juveniles as allowing the federal judiciary to undertake proceedings to determine that an individual's age, family background, school or employment record, and social circumstances warrant treatment as a juvenile and therefore preclude extradition.

Because we find that under New York (and even federal) law, Hu could have been charged with and convicted for the felony of robbery, we reverse the judgment of the district court and deny issuance of the writ.

■ The government also asks us to review and vacate the district court's grant of Hu's release on bail. We agree with the government that the standard for release on bail for persons involved in extradition proceedings is a more demanding standard than that for ordinary accused criminals awaiting trial. *Wright v. Henkel, supra,* 190 U.S. at 62, 23 S.Ct. at 786; *Beaulieu v. Hartigan,* 554 F.2d 1 (1st Cir. 1977). We recognize that, because of the treaty obligations of the United States, there is a presumption against bail in the former situation, and only "special circumstances" will justify bail. *Wright v. Henkel, supra; United States v. Williams,* 611 F.2d 914 (1st Cir. 1979); *Beaulieu v. Hartigan, supra; In Re Mitchell,* 171 F. 289 (S.D.N.Y.1909).

■ Nevertheless, our reading of the transcript of the proceedings in which the district court granted bail convinces us that the district court was well aware of the proper standard in determining whether to grant bail in these circumstances and correctly applied that standard. The court listed the "special circumstances," as involving Hu's age and background along with the lack of any suitable facility in which Hu could be held. We find no error in Hu's release on bail.

Reversed with directions to dismiss the petition.

TENNEY, District Judge, dissenting:

I would affirm the decision below and accordingly I dissent. I agree that Juveniles should not avoid extradition simply because the Federal Juvenile Delinquency Act evidences a solicitous attitude toward juveniles. And I acknowledge that the Treaty drafters may never have specifically contemplated the exclusion of juveniles. Yet the absence of a provision concerning juveniles does not necessarily reflect an intent to treat them in the same manner as adults. This absence leaves an unanswered question that must be resolved by applying the Treaty according to its terms. I do not

think Hu's extradition is authorized by the language of the Treaty and the "law of the United States" which it incorporates. Indeed, the intent of the Treaty is thwarted by the Court's refusal to look to the Juvenile Delinquency Act on the ground that the parties could not have intended to exclude juveniles since there is no express provision to that effect. Our task is to interpret and apply the Treaty as written. We should not avoid a result directed by the Treaty, even if it appears far-reaching, simply because that result is not expressly prescribed.

*The Felony Requirement*

In the context of this case, the most outstanding feature of the Treaty is the unique felony requirement, not the absence of a provision concerning juveniles. This heightened double criminality should be viewed "as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right of the accused." *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973) (Judge Friendly describing the principle of specialty which prohibits the requesting country from prosecuting the fugitive for any crimes except the crimes for which he was extradited). Section (c)'s felony requirement is the United States analogue to section (b) which provides for a direct reference to Great Britain's domestic law. Each section constitutes a strict double criminality standard which emphasizes the importance of each country's domestic law. To effectuate the intent of the Treaty, the felony requirement must be applied as directed—by reference to the law of the United States. The acts which constitute felonies will change over time. Thus, by incorporating the felony requirement, the Treaty's drafters provided a fixed prerequisite that, in turn, referred to a dynamic body of law. The Juvenile Delinquency Act is part of that body of law and must be considered in determining whether an offense constitutes a felony.

Article III serves to define the seriousness of the crime required for extradition.

To this end, it establishes two distinct requirements: the offense must be punishable by imprisonment for more than one year and the offense must fall within a category of crimes defined according to each country's domestic law. These requirements are not redundant with respect to United States law, even though a felony is now defined as an offense punishable by more than a year of imprisonment. The felony requirement is an independent standard to measure the seriousness of an offense and the Juvenile Delinquency Act addresses precisely this point. As discussed below, a proceeding under the Act results in an adjudication of delinquency, not a criminal or felony conviction. This distinction reflects a judgment concerning the gravity of a particular act committed by a juvenile. It is true that extradition turns on the status of the crime, not the status of the criminal. Yet it is not Hu's youth qua youth that prohibits extradition, but the "non-criminal" result effected by the Act that is necessarily invoked by virtue of Hu's age.

The difference between section (a)'s term of imprisonment standard and section (c)'s felony requirement is highlighted by the facts of this case. Section (a) provides that the offense must be punishable "by imprisonment or other form of detention" for more than one year. Under the Juvenile Delinquency Act, a juvenile adjudicated delinquent could be "committed to the custody of the Attorney General" for a period exceeding one year. 18 U.S.C. §§ 5037, 5039. Such commitment is clearly a form of detention, see *id.* § 5039, and could therefore satisfy section (a). Section (c), however, is not satisfied because the Act, which is applicable to Hu's case, does not provide for a felony conviction. In this case, the measure of a felony is raised above the floor established by the section (a) time requirement.

No provision in the Juvenile Delinquency Act expressly states that it should be applied to a juvenile whose extradition is sought by a foreign country. Indeed, the government argues, and the majority agrees, that the court below engaged in a speculative and unwarranted analysis. Yet

the procedure employed by Judge Weinstein was consistent with the Treaty and the Act and was calculated to minimize the speculation inherent in these proceedings.

In viewing the Magistrate's extradition order, the district court was bound to determine whether the offense for which extradition was sought was within the terms of the Treaty. *See Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). Therefore, the court had to evaluate whether the offense charged constituted a felony under United States law. This inquiry, mandated by section (c), is distinct from the question posed by section (a), which asks whether the offense is punishable by more than one year of detention. Furthermore, felony should be defined according to federal law *in this case*. As this court stated in *Shapiro v. Ferrandina, supra*, 478 F.2d at 910 n.18, reference "to federal law—when there is some—as a gauge for [a crime's] gravity appears to us quite reasonable.... [T]he makers of the Treaty might well have desired that, where possible, a uniform standard should determine the relative gravity of an offense." *See also United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975) (federal, not state, standard used to determine sufficiency of evidence); *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925, 927 n.1 (2d Cir. 1974) (federal law may govern where interstate or foreign commerce is involved, particularly if state law is preempted or precluded by valid exercise of congressional power); *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 n.1 (5th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (applying federal statute of limitations). Uniformity is particularly important in this context. The possibility that any one of maybe fifty state juvenile laws could be applied injects even more uncertainty into the extradition process.

The majority argues that "[t]he most reasonable interpretation of subsection (c) is that for conduct that would have violated any federal statute, federal law determines whether the conduct would have been a felony, and for conduct that would have violated only a state statute, state law governs the felony determination." As the majority points out, only federal crimes are felonies under federal law and a reading limiting subsection (c) to federal felonies would prevent extradition of those charged with state crimes. That is not, however, the reading advocated here and the majority's argument is essentially consistent with the view that federal law—if available—should be applied. In my opinion, the available federal law should be applied in this case in the interest of uniformity and to promote national policies.

Because he is a juvenile, Hu's offenses are neither state crimes nor federal crimes per se. The Federal Juvenile Delinquency Act was intended to encompass offenses that would otherwise be considered state crimes; the very language of the Act confirms this view. The jurisdictional determination must be made at the outset and federal law should be favored as opposed to assuming the applicability of state law. Thus, with respect to juveniles, I disagree with the majority's assertion that "for conduct that would have violated only a state statute, state law governs."

By its terms, the Juvenile Delinquency Act is not invoked unless the Attorney General certifies that the state (1) does not have jurisdiction over the juvenile "with respect to such alleged act of juvenile delinquency," or (2) does not have adequate programs available to fit the juvenile's needs. 18 U.S.C. § 5032. Although no certification was filed in this case, it is clear that New York has no jurisdiction over Hu with respect to the offenses he allegedly committed in Hong Kong. Of course, it is equally clear that Hu could not be tried in federal court for these offenses. Yet the extradition request was made to the federal government and the choice of law should reflect the national interest. The extradition proceeding itself is federal and, for the sake of consistency, the federal law on point should be applied. Since New York lacks jurisdiction over Hu's offense, New York law could never be directly applied. The speculative nature of this decision is thus

increased by relying on a hypothetical application of state law instead of inquiring whether the offense does in fact constitute a felony under federal law. In short, the majority unjustifiably avoids the inquiry mandated by the Treaty by holding that the felony requirement is satisfied "by the fact that, even considering Hu's age, he could have been charged with, convicted of, and sentenced for a felony under New York law."

Two reasons have been advanced for adopting a rule that avoids this inquiry. First, magistrates should not have to conduct elaborate hearings to predict what would happen to the accused in the hypothetical circumstance where his crime violated some federal law. Second, the provisions in other treaties that specify special treatment for juveniles suggest that the issue should be controlled by express directives, rather than by judicial hearings in individual cases.

With respect to the first objection, it is worth noting that the Second Circuit has previously approved of comprehensive hearings to determine if all the elements required for extradition were met. For example, in *Shapiro v. Ferrandina, supra*, this court conducted a detailed comparison of the Israeli charges lodged against the accused and the relevant New York law. For several of the charges, the court found that the requisite elements under New York law had not been alleged and so the accused could not be extradited for those particular offenses. Similarly, in *Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), the court of appeals directed that a hearing be held to determine the underlying facts of a statute of limitations defense that turned on the accused's intent to return at the time he left his native country. In both these cases, the hearings were conducted to evaluate facts and circumstances critical to the extradition order itself. *Cf. Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1912) (insanity defense is not to be entertained at extradition hearing); *Neely v. Henkel*, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901) (rejecting claim that extra-

dition was unconstitutional because accused's constitutional rights as a United States citizen would not be protected at a trial in requesting country); *Merino v. United States Marshall*, 326 F.2d 5 (9th Cir.), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1963) (in the absence of an express provision, statute of limitations cannot be raised as a defense to extradition proceedings). In the case at bar, the district court employed the most satisfactory method for determining, with the greatest possible certainty, whether Hu had committed an extraditable offense. Since Hu fell within that category of juveniles who would be tried under the Juvenile Delinquency Act unless a transfer to the regular criminal system was requested, the district court had to determine whether such a request would be granted. This determination is analogous to the inquiry conducted in *Shapiro* where the court compared the Israeli charges with New York's definitions of the various offenses. The *Shapiro* inquiry, like the hearing here, was also a hypothetical exercise since the accused would never be tried for the offenses in New York. This legal comparison was necessary, however, in order to implement the treaty's double criminality provision; the accused could not be extradited to Israel unless the offenses charged were also criminal under New York law. The hearing conducted here was equally necessary to determine whether Hu had committed a felony under the law of the United States.

The second objection—that the Treaty does not expressly provide for different treatment of juveniles—merely restates the problem raised by this case: in the absence of an express provision concerning juveniles, to what extent should the Juvenile Delinquency Act inform the court's construction of the felony requirement? I agree with Judge Weinstein that "[s]ilence on the point has created an ambiguity that must be resolved by the courts." And in resolving this ambiguity, careful consideration must be given to the drafters' choice of the term felony to describe the United States' double criminality standard. *See*

*United States v. Dangdee*, 616 F.2d 1118, 1119 (9th Cir. 1980), *quoting United States v. Jones*, 607 F.2d 269, 273 (9th Cir. 1979) ("The statutory language usually is the best evidence of congressional intent because 'we must assume that Congress meant what it said.'"). Felony, in this context, may mean something other than an offense punishable by more than one year of imprisonment. Otherwise, section (c)'s felony requirement is "mere surplusage" repeating section (a)'s imprisonment term—a disfavored construction that should not be adopted by this court. *See Pettis ex rel. United States v. Morrison-Knudson Co.*, 577 F.2d 668, 673 (9th Cir. 1978); *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 406 (D.C.Cir.1976); *United States v. Johnson*, 462 F.2d 423, 428 (1st Cir.), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1972); *Klein v. Republic Steel Corp.*, 435 F.2d 762, 766 (3d Cir. 1970). The absence of a specific provision concerning juveniles does not mean that the Juvenile Delinquency Act should not be considered and applied in construing the felony requirement. As the Supreme Court stated in *Barr v. United States*, 324 U.S. 83, 90, 65 S.Ct. 522, 89 L.Ed. 765 (1945), "if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." Or, as more recently asserted by the Tenth Circuit: "We will not hobble our interpretation of statutes with the requirement that every circumstance meant to be covered must be specifically mentioned." *United States v. Bates*, 617 F.2d 585, 587 n.7 (10th Cir. 1980). In my view, the situation at hand—where a court has ruled that the accused would be tried under the Federal Juvenile Delinquency Act—falls within that class of cases excluded from extradition by the unique choice of the term "felony" in the Treaty.

*The Federal Juvenile Delinquency Act*

The conclusion stated above rests on the assumption that a proceeding under the Juvenile Delinquency Act results in an adjudication of delinquency and not in a conviction of a crime. The government vehemently objects to this characterization and cites cases to support the proposition that the Act merely provides procedural protections and does not establish a separate offense. Undoubtedly, language can be culled from various decisions to support different interpretations of the Act. On balance, I find that the language of the Act and the decisions discussing its legal consequences—quite apart from the policies that it reflects—support the view that a proceeding under the Act cannot result in a criminal conviction.

The Act defines juvenile delinquency as violation of a law "which would have been a crime if committed by an adult." 18 U.S.C. § 5031. Section 5032 refers to an act committed after a juvenile's sixteenth birthday "which if committed by an adult would be a felony punishable by a maximum penalty of ten years imprisonment or more . . . ." The Act prohibits the placement of a juvenile in a "correctional institution in which he has regular contact with adults incarcerated because they have been convicted of a crime or are awaiting trial on criminal charges." *Id.* § 5039. Juveniles, in contrast, are "alleged to be delinquent" or "adjudicated delinquent"; they are neither accused nor found guilty of crimes. *See id.* §§ 5033, 5035, 5037. The message spelled out by this statutory language is clear: a juvenile tried under the Act can be adjudicated delinquent but cannot be convicted of a crime, much less a felony.

This view has been consistently espoused by the courts and numerous decisions have repeated this conclusion. *See, e. g., United States v. Frasquillo-Zomosa*, 626 F.2d 99, 101 (9th Cir. 1980); *United States v. Hill*, 538 F.2d 1072, 1074 (4th Cir. 1976); *United States v. Canniff*, 521 F.2d 565, 569 & n.2 (2d Cir. 1975), *cert. denied sub nom. Benigno v. United States*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. King*, 482 F.2d 454, 456 (6th Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973); *Cotton v. United States*, 355 F.2d 480, 481 (10th Cir. 1966); *United States v. Hoston*, 353 F.2d 723, 724 (7th Cir. 1965); *Fagerstrom v. United States*, 311 F.2d 717, 720 (8th Cir. 1963);

*United States v. E. K.*, 471 F.Supp. 924, 929 (D.Or.1979); *United States v. Kinsman*, 195 F.Supp. 271, 273 (S.D.Cal.1961); *United States v. Sprouse*, 145 F.Supp. 292, 294 (N.D.Fla.1956). The Act's legislative history also supports this view. See 1974 U.S. Code Cong. & Ad.News 5283; S.Rep.No. 1989, 75th Cong., 3d Sess. 1 (1938); H.R. Rep.No.2617, 75th Cong., 3d Sess. 2 (1938). Indeed, two sections of the Act were rewritten in 1948 "to make clear the legislative intent that a juvenile delinquency proceeding shall result in the adjudication of a status rather than the conviction of a crime." Historical and Revision Notes, 18 U.S.C. § 5033 (1969 version).

To refute this view, the government cites cases purportedly establishing that "there is no indication that the Act provides any basis to distinguish the offenses committed by a juvenile from those committed by an adult." Government's Brief at 23. These cases, however, support Hu's position and further undermine the government's argument. For example, the government relies on *United States v. Allen*, 574 F.2d 435, 437 (8th Cir. 1978), in which the Eighth Circuit stated that "the Act does not create a substantive offense with its own jurisdictional basis, but rather establishes a procedural mechanism for the treatment of juveniles who are already subject to federal jurisdiction because of the commission of acts cognizable under other federal criminal statutes." Yet this statement was made in response to the defendant's claim that, as an Indian, he should have been tried in a tribal, not a federal, court because "the status of juvenile delinquency is not one of the crimes enumerated in 18 U.S.C. § 1153," which provides for exclusive federal jurisdiction over certain offenses committed by Indians. *Id.* Although the court of appeals rejected the defendant's claim, it adhered to its prior ruling that "a finding of delinquency under the Federal Juvenile Delinquency Act is an adjudication of a status, not a conviction for a "crime." *Id., citing Fagerstrom v. United States, supra.*

*United States v. Mechem*, 509 F.2d 1193 (10th Cir. 1975), another case cited by the government, also supports the "non-convic-

tion" view. The *Mechem* court stated that the Juvenile Delinquency Act's "predominant purpose" is "procedural," but acknowledged that "there is a substantive offense of 'juvenile delinquency' dealt with by the statute." *Id.* at 1196. Following its ruling in *Cotton v. United States, supra*, the Tenth Circuit asserted that "the very purpose of the [Act] is to avoid prosecution of juveniles as criminals."

Two other cases relied upon by the government—*United States v. Powers*, 420 F.2d 937 (9th Cir. 1970), and *United States v. Essex*, 407 F.2d 214 (6th Cir. 1969)—are completely inapposite. In both cases, juveniles were adjudicated delinquent under the Act for violating a federal statute. The Ninth and the Sixth Circuits have expressly stated that an adjudication under the Act is not a conviction of a crime, *see United States v. Frasquillo-Zomosa, supra; United States v. King, supra*, and nothing in these decisions is contrary to that position. The government, in short, is grasping at straws.

The government also claims that the "non-conviction" view adopted here is based not on the terms of the Federal Juvenile Delinquency Act but on the "strong policy of the United States," a phrase used below by Judge Weinstein, reflected in that statute. Of course, the policies embodied in the Act support the view that a proceeding results in an adjudication of a status and not a conviction of a crime. Yet as discussed above, the "non-conviction" view is also amply supported by the Act's language and legislative history—a conclusion reached by numerous courts over the years. Furthermore, the argument that the Act merely provides procedural protections and thus has no bearing on the substance of the offense, actually cuts the other way. The procedural safeguards provided under the Act demonstrate that a delinquency proceeding does not result in anything resembling a conviction. For example, records of the proceedings are sealed and, with limited exceptions, no information can be released to prospective employers or other officials. 18 U.S.C. § 5038. It has been held that an adjudication of delinquency is not a convic-

tion for purposes of a state habitual criminal statute, *Rogers v. State,* 260 Ark. 232, 538 S.W.2d 300 (1976), and cannot be used for impeachment purposes in a subsequent trial. *See United States v. Harvey,* 588 F.2d 1201 (8th Cir. 1978); *United States v. Canniff, supra; Cotton v. United States, supra* ; Fed.R.Evid. 609(d). A juvenile adjudicated delinquent under the Act cannot be placed in an adult correctional institution where he would come into contact with adults convicted of crimes or awaiting trial on criminal charges. 18 U.S.C. § 5039. These important distinctions between a delinquency proceeding and a criminal trial, which transcend purely procedural matters, indicate that an adjudication of delinquency is a horse of a different color.

It is worth noting that the same result would probably be reached even if New York law were applied.[1] As previously recognized by this court in *United States v. Canniff, supra,* New York's youthful offender law is substantially similar to federal law with respect to the procedures and treatment provided for juveniles. "[T]he consistent policy running through both New York and federal law [is that] youthful offender or juvenile delinquency adjudications are not to be treated as criminal convictions and that no stigma should attach to a young person so adjudicated." 521 F.2d at 569. As a sixteen year old who allegedly committed a first degree robbery, Hu would be considered an "eligible youth" under New York's youthful offender system. N.Y.Crim.Proc.Law § 720.10 (McKinney Supp.1980). Therefore, although he could be charged and tried as an adult defendant, the court, upon conviction, would determine whether "the interest of justice would be served by relieving the eligible youth from the onus of a criminal record." *Id.* § 720.-20(1). This standard is comparable to the standard applied by Judge Weinstein pursuant to the Federal Juvenile Delinquency Act. And, as under federal law, a youthful offender adjudication "is not a judgment of conviction for a crime." *Id.* § 720.35. Assuming that a state court judge would have reached the same conclusion as Judge Weinstein with respect to the "interest of justice" in this case—a well-founded assumption on the facts presented here—Hu would not have been convicted of a felony under New York law.[2] It is true, as the majority asserts, that Hu *could* have been convicted of a felony under state law. Yet I think we should rely on and adopt an approach that leaves less to speculation and requires a closer examination of the facts of the case, even if it means conducting a fairly comprehensive hearing on the extradition petition.[3]

With respect to my view that Hu would be treated as a juvenile, not a felon, under either federal or New York law, it is worth noting that he would probably not be so treated if he were returned to Hong Kong and tried there. Although the record is incomplete on this point, it appears that Hu was charged with violating section 10(1) of the Hong Kong Theft Ordinance and would not be afforded different treatment than an adult offender. And at the initial extradition hearing in this case, the Magistrate stated that Hu is "not charged with an act of juvenile delinquency in Hong Kong. He's charged with robbery. In other words, he's not charged as a juvenile delinquent." Transcript of Hearing before Magistrate Si-

---

1. Although I disagree with the majority's ruling in this case, the panel unanimously agrees that the result should be the same under either federal or New York law. See Majority Opinion at n.5.

2. Judge Weinstein found that since coming to the United States, Hu had lived with his parents and sister, made a good adjustment at public school, and made friends among his contemporaries. He noted that Hu's parents had been gainfully employed here for some years and had no disciplinary problems with their son. According to Judge Weinstein, Hu is mature, appears to be of superior intelligence, has worked hard in school, and has conformed to his parents' wishes.

3. The majority obviously condones the factual inquiry which was conducted by Judge Weinstein to determine whether Hu should be released on bail. I agree with the majority's ruling that the lower court properly applied the appropriate standard in ordering Hu released on bail.

mon Chrein, July 24, 1980, at 10. In light of this divergence between the way in which Hu's offense would be defined and treated here and in Hong Kong, the principle of double criminality requires that extradition be denied.

### Conclusion

The thorny issue raised by this case could easily have been avoided by the inclusion of an express treaty provision concerning juveniles. Perhaps this decision will prompt treaty drafters to be more explicit in the future and to consider circumstances like those present here. And since treaties are not carved in stone, perhaps the very document involved in this case might be amended to cover such contingencies. While courts are powerless to direct such changes, they can help to define the problem and to underscore the need for a new or different approach.

The decision below, which I would affirm, would allow Hu to remain in this country where he could be neither criminally prosecuted nor adjudged delinquent for the offenses he allegedly committed in Hong Kong. At first blush this result may appear unsettling, especially since Hu fares better than an American juvenile who commits the same offense here and is subject to delinquency proceedings. Yet if Hu's acts constituted a misdemeanor, as opposed to a felony, he would also have avoided both extradition and prosecution, a fate to be envied by every native misdemeanant. In both cases, the results are mandated by the Treaty's felony requirement and the relevant United States law. Our task is to interpret that requirement by applying the pertinent law. Upon completing that analysis, I conclude that Hu's alleged offense does not constitute a felony under United States law and that he cannot be extradited. I therefore dissent from the majority's decision.